1  C. ANDREW WATERS, CA Bar No. 147259
   waters@waterskraus.com
2  MICHAEL L. ARMITAGE, CA Bar No. 152740
   armitage@waterskraus.com
3  PAUL COOK, CA Bar No. 170901
   pcook@waterskraus.com
4
   MICHAEL B. GURIEN, CA Bar No. 180538
5  mgurien@waterskraus.com
6
7  WATERS & KRAUS, LLP
   222 North Sepulveda Boulevard, Suite 1900
8  El Segundo, California 90245
   Tel: (310) 414-8146
9  Fax: (310) 414-8156
10
   Attorneys for Relator Stephen Hamilton
11

**FILED**

**APR 1 6 2008**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**SEALED**
BY COURT ORDER

12

13          **IN THE UNITED STATES DISTRICT COURT**
14       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. Stephen Hamilton, Relator, | § § § |
| STATE OF ARKANSAS ex rel. Stephen Hamilton, Relator, | § § § |
| STATE OF CALIFORNIA ex rel. Stephen Hamilton, Relator, | § § § § |
| STATE OF DELAWARE ex rel. Stephen Hamilton, Relator, | § § § |
| DISTRICT OF COLUMBIA ex rel. Stephen Hamilton, Relator, | § § § |
| STATE OF FLORIDA ex rel. Stephen Hamilton, Relator, | § § § |
| STATE OF GEORGIA ex rel. Stephen Hamilton, Relator, | § § § § |

**CV 08** Civil Action No. _____ **1986**

**DEMAND FOR JURY TRIAL**

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

**DO NOT ENTER INTO PACER**

**DO NOT PLACE IN PRESS BOX**

- 1 -
COMPLAINT FOR DAMAGES

1  STATE OF HAWAII ex rel. Stephen §
2  Hamilton, Relator,                §
                                     §
3  STATE OF ILLINOIS ex rel.         §
4  Stephen Hamilton, Relator,        §
                                     §
5  STATE OF INDIANA ex rel.          §
6  Stephen Hamilton, Relator,        §
                                     §
7  STATE OF LOUISIANA ex rel.        §
   Stephen Hamilton, Relator,        §
8                                    §
9  STATE OF MASSACHUSETTS ex         §
   rel. Stephen Hamilton, Relator,   §
10                                   §
11 STATE OF MICHIGAN ex rel.         §
   Stephen Hamilton, Relator,        §
12                                   §
13 STATE OF MONTANA ex rel.          §
   Stephen Hamilton, Relator,        §
14                                   §
15 STATE OF NEVADA ex rel.           §
   Stephen Hamilton, Relator,        §
16                                   §
17 STATE OF NEW HAMPSHIRE ex         §
   rel. Stephen Hamilton, Relator,   §
18                                   §
19 STATE OF NEW JERSEY ex rel.       §
   Stephen Hamilton, Relator,        §
20                                   §
21 STATE OF NEW MEXICO ex rel.       §
   Stephen Hamilton, Relator,        §
22                                   §
23 STATE OF NEW YORK ex rel.         §
   Stephen Hamilton, Relator,        §
24                                   §
25 STATE OF OKLAHOMA ex rel.         §
   Stephen Hamilton, Relator,        §
26                                   §
27 STATE OF RHODE ISLAND ex rel.     §
   Stephen Hamilton, Relator,        §
28                                   §
   STATE OF TENNESSEE ex rel.        §

1 Stephen Hamilton, Relator,                                        §
                                                                   §
2                                                                  §
   STATE OF TEXAS ex rel. Stephen                                  §
3 Hamilton, Relator,                                               §
                                                                   §
4                                                                  §
   STATE OF VIRGINIA ex rel.                                       §
5 Stephen Hamilton, Relator,                                       §
                                                                   §
6                                                                  §
   STATE OF WISCONSIN ex rel.                                      §
7 Stephen Hamilton, Relator,                                       §
                                                                   §
8 vs.                                                              §
                                                                   §
9                                                                  §
                                                                   §
10 SANOFI-AVENTIS; AND JOHN                                        §
                                                                   §
11 DOES 1-10,                                                      §
                                                                   §
12 Defendants.                                                     §

13

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL

### I.  INTRODUCTION

1.  Sanofi-Aventis ("Sanofi") manufactures, among other pharmaceutical products, Ambien (zolpidem tartrate), a schedule IV drug that is used as a sleep aid. Ambien is one of Sanofi's best-selling products and leads the market among sleep aids. Ambien was first approved for use by the Food and Drug Administration in December 1992. At the time, it was indicated for the short-term treatment of insomnia. The approved label noted that hypnotics such as Ambien "should generally be limited to 7-10 days of use." The label also noted that Ambien should not be prescribed in quantities exceeding a 1-month supply, and that Ambien had been shown to be effective in decreasing sleep latency and increasing sleep duration for up to 5 weeks.

2.     In about October 2001, Relator Stephen Hamilton began to work for Sanofi as a pharmaceutical representative.  One of the drugs he was directed to promote was Ambien.  Specifically, Sanofi directed Mr. Hamilton and other sales representatives to promote Ambien not only as a short-term sleep aid, but also for use as a long-term aid. This use was not approved by the FDA, and as such was off-label.  Sanofi also pursued a scheme of promoting Ambien for use in psychiatric patients, especially those taking selective serotonin reuptake inhibitors (SSRIs).  Such promotion was also for off-label uses, since Ambien's label made clear that Ambien usage could cause anxiety and depression.  Ambien was also promoted for use in pain patients and post-menopausal women.  Sanofi encouraged its sales representatives to provide physicians with lavish meals, participation in consulting councils and speakers' bureaus, and trips in order to secure prescriptions of Ambien.

3.     On or about September 2005, Sanofi received approval from the FDA to market Ambien CR, a controlled release formulation of Ambien.  Upon information and belief, Sanofi sought approval to market and sell Ambien CR because the patent on Ambien was to expire in 2007.  As such, Sanofi pursued an extraordinary, aggressive market strategy to convert all Ambien prescriptions to prescriptions for Ambien CR.  As part of this strategy, Sanofi actually stopped promoting Ambien, even though its patent did not expire for more than a year.  All sales representatives were ordered to stop providing Ambien samples to doctors as well.

4.     Further, and more important, as part of its new marketing strategy, Sanofi explicitly misrepresented the efficacy and proper use of Ambien CR and recommended

that even patients who were responding well to Ambien be switched to Ambien CR. Sanofi also promoted Ambien CR for long-term use, an indication for which Sanofi did not receive FDA approval until December 2007. Sanofi also promoted Ambien CR for off-label use in psychiatric patients, in patients with pain disorders, and in post-menopausal women. Sanofi coached doctors, nurses, and pharmacies in how to fill out fraudulent prior authorization requests in order to get Medicaid insurers to approve Ambien CR for patients who did not need it. Moreover, Sanofi provided kickbacks to doctors, nurses, and pharmacies in order to ensure such prescription switching. Sanofi's fraudulent scheme to have all Ambien prescriptions changed to prescriptions for Ambien CR—often in instances in which there was no medical reason to make the change—caused the Government and the States to pay more for prescriptions that they should have, especially after April 2007, when the FDA approved the first generic versions of Ambien.

## II.   PARTIES

5.   Relator Stephen Hamilton is a citizen of the United States and a resident of the State of California.   He was employed by Sanofi as a sales representative in Los Angeles, California, for more than four years, and as such, developed firsthand knowledge of the facts set forth herein. Stephen Hamilton is thus the original source of the facts and information set forth in this Complaint concerning the activities of Sanofi. The facts averred herein are based entirely upon his personal observation and documents in his possession.

6.   Relator has provided to the United States Attorney and the Attorneys General

of Arkansas, California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Montana, New Hampshire, New Jersey, New Mexico, New York, Nevada, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin and the District of Columbia a full disclosure of substantially all material facts, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), and relevant state statutes.

7.     Defendant Sanofi-Aventis is incorporated in the State of Delaware, with its corporate headquarters in Bridgewater, New Jersey. Sanofi-Aventis is principally engaged in the manufacture and sale of pharmaceuticals including prescription pharmaceuticals falling under the jurisdiction and regulation of the U.S. Food and Drug Administration.

### III.    JURISDICTION AND VENUE

8.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for Counts 7 - 30 arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

9.     At all times material to this Complaint Sanofi-Aventis regularly conducted substantial business within the State of California, maintained permanent employees and offices in California, and made and is making significant sales within California. Sanofi is thus subject to personal jurisdiction in California.

10.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Sanofi transacts business in this district.

## IV.    FACTS

### A.    Sanofi Engaged in Off-Label Promotion of Ambien and Ambien CR

11.    The Federal Food, Drug and Cosmetic Act ("FDCA"), among other things, governs the lawful interstate distribution of drugs for human use.  As codified at Title 21, United States Code, sections 331 *et seq.*, and specifically at § 355(b), the FDCA and its implementing regulations require that before a new drug may legally be distributed in interstate commerce, a sponsor of a new drug product must submit a New Drug Application ("NDA").

12.    The FDCA requires, at 21 U.S.C. § 355, that the NDA sponsor submit to the United States Food and Drug Administration ("FDA") as part of an NDA, proposed labeling for the proposed intended uses for the drug that include, among other things, the conditions for therapeutic use.  The NDA must also provide, to the satisfaction of the FDA, data generated in randomized and well-controlled clinical trials that demonstrates that the drug will be safe and effective when used in accordance with the proposed labeling.

13.    The FDCA, 21 U.S.C. § 355, prohibits the introduction into interstate commerce of any new drug, unless an approval of an NDA is effective.  Only after the NDA, including the proposed labeling, is reviewed and approved by the FDA is the sponsor permitted by law to promote and market the drug, and only for the medical

conditions of use specified in the approved labeling, for which use the FDA has found sufficient evidence of safety and effectiveness. Uses not approved by the FDA and not included in the drug's approved labeling are called "unapproved uses" or "off-label" uses.

14.     The FDCA and the regulations promulgated thereunder require that, in order to label or promote a drug for a use different from the conditions for use specified in the approved labeling, the sponsor has to file a new NDA or amend the existing NDA by, among other requirements, submitting the newly proposed indications for use and evidence, in the form of randomized and well-controlled clinical studies, sufficient to demonstrate that the drug would be safe and effective for the newly proposed therapeutic use or uses. 21 U.S.C. § 360aaa, *et seq.* Only upon approval of the new NDA can the sponsor promote the drug for the new intended use.

15.     Sanofi specifically directed its sales representatives to promote Ambien and Ambien CR for uses that were not contemplated by the FDA-approved label. Sanofi promoted Ambien and Ambien CR for long-term insomnia therapy, promoted Ambien use at a dosage double that provided by the label, and promoted Ambien and Ambien CR for use in psychiatric patients, especially those taking SSRIs, and in patients experiencing pain, such as those with arthritis and fibromyalgia.

## 1. Promotion of Ambien and Ambien CR for Long-Term Use

16.     On or about January 26, 1989, Lorex Pharmaceuticals[1] submitted NDA 19-

---

[1] Lorex Pharmaceuticals ("Lorex") was a joint venture between G.D. Searle & Co. and Sanofi-Synthelabo. Searle owned 51% of Lorex and Sanofi-Synthelabo owned 49%. Sanofi-Synthelabo acquired Searle's 51% interest in Lorex in 2002. In
Continued on the next page

908 for Ambien (zolpidem tartrate). The FDA approved Ambien for use on December 16, 1992. Specifically, the FDA approved Ambien for the short-term treatment of insomnia. The "Indications and Usage" section of the label approved by the FDA makes clear that Ambien was approved generally for usage for 7-10 day periods, and, at the most, for a period of 5 weeks.

17.    On or about July 2005, Sanofi submitted NDA 21-774 for Ambien CR (zolpidem tartrate). The FDA approved Ambien CR on September 2, 2005, for the treatment of insomnia, characterized by difficulties with sleep onset and/or sleep maintenance (as measure by wake time after sleep onset). The "Indications and Usage" section of the FDA-approved label specifically noted that the clinical trials performed in support of efficacy were "3 weeks in duration, although the final formal assessments of sleep latency and maintenance were performed after 2 weeks of treatment." In other words, Ambien CR was only approved for short-term use.

18.    Indeed, Sanofi clearly understood that the FDA's original approval of Ambien CR was for short term usage because in February 2007, Sanofi made a supplemental application to have Ambien CR approved for increased duration of use (6 months). The FDA eventually approved such usage on December 20, 2007. However, prior to that date, the promotion of Ambien and Ambien CR for long-term use was clearly not approved and was therefore off-label. Nevertheless, prior to December 2007, and at least as early as on or around 2003, Sanofi specifically directed its sales representatives

Continued from the previous page
2004, Sanofi-Synthelabo acquired Aventis and the company became known as Sanofi-Aventis.

to promote both Ambien and then Ambien CR for long-term use.

19.    For example, a coaching sheet for sales representatives distributed by Sanofi (and marked "For Internal Use Only") directed such representatives to dispute the FDA-approved label indicating that prescriptions should be limited to 7-10 days.  The form, entitled "Field Sales force FAQ '7-10' days," provides "appropriate ways to handle" physicians' objections that Ambien can only be prescribed for 7-10 days.  The form directs sales representatives to tell doctors that the FDA's labeling recommendations "were not the direct result of a concern for the efficacy/safety data related to the treatment options (hypnotics), but rather to encourage physicians to uncover and treat any underlying conditions (i.e. depression) that may be contributing to the insomnia." Sales representatives were also directed to explain to physicians that the 7-10 day limit on the package insert was irrelevant and was based on fears that arose in the United Kingdom over Halcion addiction. Sales representatives were also to tell physicians that they "can continue to treat insomnia as appropriate for [their] patients."

20.    When physicians had further queries about the off-label use of Ambien for more than 7-10 days, sales representatives were directed by Sanofi to fill out a form so that Sanofi could send a fax (called a "faxback") to the physician with studies that looked at the long-term use of Ambien.

21.    Additionally, sales representatives were provided with information on long-term use of Ambien so that they could detail physicians about such usage. For example, Sanofi produced a document entitled "Long-term use," that was provided to sales representatives.  The document discusses studies regarding the efficacy and safety of

1 Ambien use for 5 weeks, 8 weeks, 12 weeks, and 179 days.

2     22.    Sanofi sales representatives were also given specific instructions from their
3
4 district managers to promote Ambien for long-term use. In a November 12, 2004 mid-
5 year review of Mr. Hamilton, Sanofi district manager Rodney Carr instructed him to
6 "focus on LOT [length of treatment] for increased Rx's" for Ambien. Carr also wrote
7
8 that Hamilton should "focus on high-volume Medi-Cal physicians."

9     23.    In a July 12, 2006 e-mail to sales representatives, Sanofi district manager
10 Mary DePond stated that a new Ambien CR study had been released that promoted the
11 off-label long term use of the drug. The study was paid for by Sanofi and was to be
12
13 used by sales representatives to promote a long length of treatment on Ambien CR,
14 despite the FDA-approved label indicating that length of treatment should be limited to
15 7-10 days or 2 weeks.
16
17     24.    Sanofi focused its efforts to promote off-label prescriptions of Ambien and
18 Ambien CR among doctors whose patient population was composed mainly of
19 Medicaid and Medicare subscribers.
20
21     25.    In addition to detailing doctors about the off-label long-term use of Ambien
22 and Ambien CR, Sanofi also provided doctors with discount cards that allowed and
23 encouraged their patients to have access to at least 100-pills of Ambien CR. Concerned
24 that physicians would not prescribe Ambien CR to their patients because Ambien CR
25
26 was often on a higher tier on drug formularies than Ambien (and later the generic), and
27 therefore cost their patients more through higher co-pays, Sanofi provided to physicians
28 "discount cards." Specifically, Sanofi instructed its sales representatives to tell doctors

that their patients could get a 7-day free trial offer of Ambien CR, and then, once the doctor wrote a prescription, the patient could get a discount offer card that would provide "a significant savings off their first 5 prescriptions of Ambien CR by providing them with up to $20 off each script." In effect, the provision of these discount cards encouraged physicians to write prescriptions, that with refills, meant that patients could get 100 pills of Ambien CR.

26. Sanofi instructed its sales representatives to deliver "the core differentiation message" that Ambien CR may be prescribed as long as medically necessary.

27. An April 2006 Business Plan for Ambien CR for the Santa Barbara districts specifically tells sales representatives to emphasize that Ambien CR could be prescribed as long as medically necessary, even though Ambien CR was not approved for prescription beyond 3 weeks until December 20, 2007.

## 2. Promotion of Ambien and Ambien CR for Psychiatric Patients

28. As part of its plan for broadening and maintaining market share, Sanofi specifically targeted psychiatrists and psychiatric patients to encourage their prescription and use of Ambien and Ambien CR. The use of Ambien and Ambien CR for psychiatric patients who were not experiencing insomnia is not approved by the FDA and is therefore an off-label use.

29. In order for a use to be approved in specific patient subgroups, mention of that patient subgroup must appear in the "Indications and Usage" section of the approved label. See, e.g., Food and Drug Administration Final Rule, "Specific Requirements on Content and Format of Labeling for Human Prescription Drugs; Addition of 'Geriatric

Use' Subsection in the Labeling," 62 Fed.Reg. 45313, 45314 (August 27, 1997); see also 21 C.F.R. § 201.057(f)(10)). Where the sponsor of a drug wants to market to a specific subgroup of a larger population for which the drug is already approved for use, regulations require that a supplemental application be submitted for approval because the agency considers such a use to be "a new use." See Food and Drug Administration, Dissemination of Information on Unapproved/New Uses for Marketed Drugs, 21 CFR Parts 16 and 99, Comments to Final Rule, November 20, 1998. 63 FR 64556-01 at 64559.

30.     Sanofi recognized that in order to promote uses of its products in sub-groups, it had to obtain FDA approval to do so. For this reason, in or about January and April 2007, Sanofi submitted supplemental applications for approval of the use of Ambien for the treatment of Attention-Deficit-Hyperactivity-Disorder associated insomnia in pediatric patients. Sanofi never submitted supplemental applications for approval of Ambien in patients experiencing depression or other psychiatric disorders. In fact, the approved label for Ambien indicated that the prescription of Ambien to such patients may be contraindicated.

31.     For example, the FDA-approved Ambien label says that "Ambien should be administered with caution to patients exhibiting signs or symptoms of depression."

32.     Notations in the 2002 American Hospital Formulary Service ("AHFS") Drug Information guide explain that depression occurred in 2% of patients receiving prolonged therapy (4-5 weeks) with zolpidem at recommended doses. Moreover, anxiety and nervousness occurred in 1% of such patients.

33.   The FDA-approved label for Ambien CR notes that in "primarily depressed patients, worsening of depression, including suicidal thinking, has been reported in association with the use of sedative/hypnotics."   The label specifically notes, "Sedative/hypnotic drugs should be administered with caution to patients exhibiting signs or symptoms of depression.   Suicidal tendencies may be present in such patients and protective measures may be required.   Intentional overdosage is more common in this group of patients; therefore, the least amount of drug that is feasible should be prescribed for the patient at any one time."   The label warns that changes in behavior associated with use of Ambien CR may include "agitation," "worsening of depression," and "suicidal thoughts."

34.   Therefore, although the labeling of Ambien and Ambien CR contemplated their use by psychiatric patients, due to the acknowledged risks of taking these drugs, the use of Ambien and Ambien CR in psychiatric patients without insomnia certainly was neither contemplated nor approved.

35.   Nevertheless, Sanofi trained and directed its sales force to promote the use of Ambien and Ambien CR in psychiatric patients, regardless of whether the patients were exhibiting insomnia.   For example, a sales training sheet produced by Sanofi instructs sales representatives to tell physicians and psychiatrists that "its [*sic*] important to know that 'sleep disturbances are rather common side effects during treatment of SSRIs and may arise during both acute and long term treatment' and that your peers are proactively prescribing concomitant treatment for their patients with major depression."   The same document suggests that sales representatives tell physicians and psychiatrists that "the

textbook Clinical Sleep Disorders states that 'persistent insomnia following successful treatment of depression is associated with a greater risk of any psychiatric disorder, depression and anxiety disorders." Sales representatives were also to probe physicians and psychiatrists by telling them that their peers "are taking a more proactive approach to uncovering and treating insomnia with their anxiety patients." The training form also instructs sales representatives to discuss a paper with physicians and psychiatrists that suggests "that treatment outcomes are improved when depression and insomnia are aggressively treated together. Many of your colleagues support this type of treatment." Sales representatives were also instructed to tell physicians and psychiatrists that "A study suggests that as many as 75% of bipolar patients are reporting difficulty getting a good night [*sic*] sleep. After speaking with many doctors, they seem to agree with these findings."

36.     Sanofi also trained and instructed its sales representatives to suggest to physicians and psychiatrists that Ambien and Ambien CR be prescribed proactively to all of their patients taking SSRIs, without regard to whether the patients currently had insomnia or sleep disturbances. In support of this aggressive posture with respect to using Ambien and Ambien CR in psychiatric patients, Sanofi required its sales representatives to take copies of Asnis et al., <u>Zolpidem for persistent insomnia in SSRI-treated depressed patients</u> to doctors offices and to leave them with any physician who prescribed SSRIs. Sales representatives were trained repeatedly to tell doctors that all patients starting on SSRIs should be given a fourteen to thirty-day supply of Ambien. This practice occurred during the entire time Mr. Hamilton worked at Sanofi, and upon

information and belief, continues to the present day.

37.     Further, Sanofi's marketing department sent some physicians and psychiatrists faxbacks describing Ambien interactions with psychiatric drugs including SSRIs. These faxbacks were meant to assuage concerns about prescribing Ambien concomitantly with SSRIs and other psychiatric drugs.

38.     In its efforts to have Ambien and Ambien CR prescribed off-label to psychiatric patients, Sanofi specifically targeted psychiatrists and their practices for detailing.  For example, the July 2006 sales plan for Mr. Hamilton's sales team stated that they would be actively inviting psychiatrists to a CME program about the off-label use of Ambien CR in psychiatric patients.

39.     In a June 2004 Field Coaching Report, Sanofi district manager Rodney Carr instructed Mr. Hamilton to have a list of his most influential psychistrists and a list of his highest prescribing Ambien doctors in order evaluate and develop an action plan going forward.  Carr instructed his sales team to hold a dinner meeting for influential psychiatrists in order to increase Ambien prescriptions off-label for psychiatric patients.

40.     On April 26, 2006, Sanofi district manager Mary DePond, in a Field Coaching Report for Mr. Hamilton, complimented him for promoting Ambien CR for patients with depression.

41.     Sanofi also provided Continuing Medical Education programs for physicians and psychiatrists to encourage them to prescribe Ambien and Ambien CR off-label for psychiatric patients.  Sanofi trained physicians and psychiatrists to promote this off-label use in lectures to other doctors and provided slides, training, and other materials to

doctors that encouraged and promoted the off-label prescription of Ambien and Ambien CR in psychiatric patients.

42.     For example, an October 2003 Monthly Marketing Report by Sanofi district manager Nancy Reid stated that a Sanofi representative met several times with a Dr. Raskin to help him prepare for his first lecture on Ambien. According to the report, Dr. Raskin did "an excellent job[.   H]e covered all aspects of sleep, discussed the importance of using Ambien with SSRI's, talked about the pain patients, and then asked the group to share any case studies they had."

43.     An Ambien CR CD produced by Sanofi promoted Ambien CR off-label for patients taking psychiatric medications.  The CD included slides that told physicians that by the end of "this lesson" they would be able to "1. identify the only drug class currently approved by the FDA as therapy for insomnia" and "2. list three reasons why agents are used off-label for the treatment of insomnia."  The slides also suggested to viewers that "Optimal treatment of mental disorders should account for the presence of insomnia.  Treatment should also consider the effect that mental disorder medications have on sleep."  Sanofi created these slides to be used by doctors who were trained by Sanofi to give continuing medical education programs.

44.     In January 2005, Ambien Marketing organized a Clinical Advisory Board dinner program for psychiatrists on the use of Ambien, facilitated by psychiatrist Milton Erman.  Sales representatives were instructed to invite local area psychiatrists to this program, and each attending psychiatrist was paid a $300 honorarium to attend.  One psychiatrist who attended was Dr. Daniel Iacopi.  Mr. Hamilton recalls that Dr. Iacopi

dramatically increased the number of Ambien prescriptions he wrote after attending the event.

### 3. Promotion of Ambien and Ambien CR for Pain Patients & Other Off-Label Promotion

45.     Sanofi also promoted Ambien and Ambien CR for patients experiencing different pain disorders, without seeking approval from the FDA for use of these drugs in these patient sub-populations.

46.     For example, Sanofi instructed its sales representatives to target rheumatologists.  Mr. Hamilton was instructed to detail rheumatologists in Sherman Oaks, California and to promote Ambien off-label to them for their patients with fibromyalgia, arthritis, and other pain disorders.  In addition, Sanofi produced faxbacks to physicians about the use of Ambien for patients diagnosed with fibromyalgia.

47.     Mr. Hamilton's target doctor list for Ambien from December 19, 2003 included 5 plastic surgeons (Dr. Haworth, Dr. Hymes, Dr. Kanodia, Dr. Koplin, and Dr. Mueller), an orthopedic surgeon (Dr. Sperling), two rheumatologists (Dr. Fan and Dr. Popel), 2 oncologists (Dr. Jacobs and Dr. Olsen), and seventeen cardiologists.

48.     On April 26, 2006, Sanofi district manager Mary DePond wrote a Field Coaching Report for Mr. Hamilton, complimenting him for promoting Ambien CR for pain patients.

49.     In about June 2006, Los Angeles sales representatives were given a document called "Beverly Hills (90210 & 90069) Non-target Opportunity," that listed plastic surgeons and surgeons who were to be called on in order to promote Ambien CR use for

their pain patients. Sanofi routinely required sales representatives to pay visits to surgeons in order to encourage them to prescribe Ambien and Ambien CR for all of their post-operative patients for one or two weeks after surgery.

50. Sanofi also provided Continuing Medical Education programs for physicians to encourage them to prescribe Ambien and Ambien CR off-label for pain patients. Sanofi trained physicians to promote this off-label use in lectures to other doctors and provided slides, training, and other materials to doctors that encouraged and promoted the off-label prescription of Ambien and Ambien CR in pain patients.

51. For example, an October 2003 Monthly Marketing Report by Sanofi district manager Nancy Reid stated that a Sanofi representative met several times with a Dr. Raskin to help him prepare for his first lecture on Ambien. According to the report, Dr. Raskin "covered all aspects of sleep, discussed the importance of using Ambien with SSRI's, talked about the pain patients, and then asked the group to share any case studies they had."

52. Sanofi's advertising campaign for pharmacists also noted that "comorbid medical conditions" included "psychiatric illness, arthritis, heart failure, pulmonary disorders, gastrointestinal disorders, Parkinson's disease, stroke, and incontinence."

53. Indeed, Sanofi also marketed Ambien and Ambien CR for use off-label in order to prevent heart attacks. A sales training document instructs sales representatives to quote a "recent Harvard study" showing that "there is a 40% increased risk of cardiovascular events in people who slept 5 hours vs. those who slept 7. As a result, many thought leaders are treating insomnia more proactively." In other words, Sanofi

was encouraging doctors to prescribe Ambien to patients who were sleeping fewer than 7 hours of sleep a night—not patients with clinical insomnia—in order to prevent heart attacks. Sanofi instructed its sales representatives to target cardiologists with this off-label message.

54.     Sanofi also promoted use of Ambien and Ambien CR in post-menopausal women. Sanofi never sought FDA approval for marketing of Ambien and Ambien CR to this patient sub-population.

### 4. Promotion of Ambien at High Dosages

55.     The FDA-approved label for Ambien provides that the product can be prescribed in two different dose-sized pills:  5 milligrams (for use in elderly patients) and 10 milligrams.  Nevertheless, Sanofi trained and instructed its sales representatives to tell physicians that it is acceptable to prescribe double the dose of Ambien—20 mg instead of 10 mg—because 20 mg was the standard starting dose among European doctors.

56.     During home office training in or about August 2003, Mr. Hamilton was instructed by Sanofi to tell physicians that if their patients were not sleeping on a 10-milligram dose, they should try a 20-milligram dose, which was the accepted dose among European doctors.  This training occurred at all major training meetings that Mr. Hamilton attended during his career at Sanofi.

57.     A brochure on "Bedtime doses higher than 10 mg," which was faxed to physicians upon request indicates that "[d]aily doses higher than 10 mg have been used in some clinical studies.  However, Sanofi-Synthelabo, Inc. cannot recommend that

doses in excess of 10 mg/day be used." However, the form describes a study in which doses of 20 mg were given to 107 insomnia patients over a 6-month period. Sanofi summarizes the study as finding, "Despite the high doses and 6-month duration of use, no rebound insomnia or tolerance was reported." This faxback was used to encourage physicians to prescribe Ambien at doses higher than those approved by the FDA.

58. In fact, based on the above information sales representatives in the Los Angeles group in which Mr. Hamilton worked presented to physicians, a number of California physicians began to prescribe 20 mg doses for patients who were having difficulty sleeping when taking only the approved 10 mg dose. Because the pills came in only 10 mg and 5 mg doses, this meant that physicians were prescribing double the amount of pills to many of their patients. In turn, for those patients on Medicaid, the federal and state governments were paying twice as much for pills than they would have had the FDA-approved dosing been followed.

\* \* \*

59. Whether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use of the drug will be reimbursed under the federal and state Medicaid programs. Reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." Id. § 1396r-8(k)(3). A medically accepted indication, in turn, includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in specified drug compendia. Id. § 1396r-8(k)(6).

See also id. § 1396r-8(g)(1)(B)(i). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid. Likewise, many state Medicaid agencies intend not to reimburse for prescription drugs not set forth in the drug compendia because they do not wish to spend money on prescriptions not recognized as medically necessary in sources specified by federal law. Ambien and Ambien CR were not eligible for reimbursement from federal or state Medicaid programs when prescribed for long-term use, or for use in psychiatric, pain or cardiovascular patients or in post-menopausal women without clinical insomnia or sleep disturbance because such usage was not included in the compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(i). Moreover, the compendia do not include any recommendation that Ambien be prescribed at doses larger than those approved by the FDA.

60. Sanofi's conduct caused physicians to submit numerous prescriptions for Ambien and Ambien CR that were ineligible for reimbursement under Medicaid because they were prescribed for an off-label use, including, but not limited to, for long-term use and for use in psychiatric, pain, and cardiovascular patients who did not have clinically evident insomnia or sleep disturbances. Sanofi thus caused the submission of false claims for payment of money under the federal Medicaid program, Medi-Cal (California's Medicaid program), and other state Medicaid programs.

61. By falsely presenting Ambien and Ambien CR as having properties that they did not, Sanofi also caused physicians to write prescriptions that impliedly certified that

the drug was medically necessary and appropriate. These certifications were false. Nonetheless, Medicaid and Medicare relied upon them in paying for Ambien and Ambien CR in patients who did not have conditions for which Ambien and Ambien CR were approved for treatment. Had the Government and the States known that these prescriptions were for unapproved, off-label uses, it would not have paid them pursuant to Medicaid (and Medicare). Thus, Sanofi's actions caused the United States and the various States to suffer monetary damages.

## B.  Sanofi Engaged in Off-Label Promotion of Uroxatral and Plavix

62.  Sanofi also fraudulently marketed two other drugs, Uroxatral and Plavix, for off-label uses that were not contemplated by the FDA's approval of those drugs or by the drug compendia. Specifically, Sanofi instructed its sales representatives to promote Uroxatral (Alfuzosin Hydrochloride) for use in patients with erectile dysfunction. Uroxatral (NDA 21-287) was approved in or about June 2003 for treating benign prostatic hyperplasia.

63.  Sanofi also instructed its salespeople to promote Plavix off-label for long-term treatment following a stent procedure or stroke. On or about November 17, 1997, Plavix (clopidogrel bisulfate) was approved for use in reducing the risk of ischemic stroke, myocardial infarction, or vascular death in patients with documented atherosclerosis. On or about February 2002, the FDA further approved Plavix for use in reducing the acute and long-term risk of future heart attack, stroke, or cardiovascular death in patients with acute coronary syndrome (ACS). Plavix was approved for short-term use—namely 30 days—after such procedures or after a stroke. However, Sanofi

trained its salespeople to stress that Plavix ought to be prescribed long-term in patients with drug-coated stents and stroke patients.

64.     For example, sales representatives were given a Sanofi analysis of an August 2003 research study on Plavix for post-stroke patients by Drs. Hardie and Hankey. Sales representatives were trained to use this analysis to promote Plavix as a life-long treatment for post-stroke patients.  Sales representatives were also coached to promote Plavix for long-term use in patients following a stent procedure.     In 2003, Mr. Hamilton was instructed to stress "length of treatment" for Plavix in his visits to physicians. In September 2005, district manager Tim Miller instructed sales representatives to promote Plavix off-label for long-term treatment for patients with drug-coated stents "with all physicians."   And in November 2006, district manager Mary DePond reminded Mr. Hamilton that Sanofi considered "length of treatment" a core sales message for Plavix and instructed him to continue to "reinforce indication, L.O.T." for Plavix.

## C. Sanofi Used Fraudulent Marketing to Encourage Doctors to Switch Their Patients with Ambien Prescriptions to Prescriptions for Ambien CR

65.     On or about September 2005, Sanofi gained FDA approval to market Ambien CR, a controlled release formulation of Ambien that medicated the patient in two stages: first upon taking the medication, and then a few hours later during sleep. Sanofi sought to market Ambien CR as a replacement for Ambien, which was to go off patent in about a year and a half later, in April 2007.  Due to the billions of dollars in profit that Ambien was generating for Sanofi, Ambien CR was formulated as a replacement

for income that would be lost when generic versions of Ambien became available.

66.    Once the FDA approved Ambien CR, Sanofi engaged in an extraordinary, highly aggressive marketing campaign to ensure that all Ambien prescriptions were switched to Ambien CR.  For example, a 2006 Santa Barbara Business Plan for Ambien CR informs sales representatives that Sanofi's "primary business strategy is to maintain Ambien's market leadership position through a swift and aggressive conversion to Ambien CR."   Sales representatives were ordered to "maximize key conversion resources:  samples, speaker programs, debit cards."

67.    In order to encourage physicians to make the switch, Sanofi touted Ambien CR as a superior product to Ambien.  For example, a 2006 Sanofi advertisement for Ambien CR claimed that the drug was more satisfying to patients.  A 2006 Business Plan notes as a "core message" for promoting Ambien CR the fact that "[p]atient satisfaction with Ambien CR is high, as reported by MD's."

68.    In fact, Ambien CR was neither more effective nor more satisfactory to patients than Ambien.  A comparison of the Ambien and Ambien CR labels reveals that patients taking Ambien experienced no residual next day effects, while the rate of next-day somnolence for patients taking Ambien CR was 15%.

**1.    Sanofi Encouraged Physicians to Change Ambien Prescriptions to Prescriptions for Ambien CR By Promoting the Off-Label Uses of Ambien CR**

69.    Moreover, Sanofi instructed its sales representatives to tell physicians that Ambien CR was safe for long-term use.  However, a Blue Cross document from about May 2006 noted that Ambien CR was "of questionable value" in comparison to

1  Ambien, and that Ambien CR "lack[ed] data in regards to safety and efficacy beyond 14

2  days."    The document further stated, "In fact, the data allude to a decrease in

3

4  effectiveness over the 14 days as measured by wake time after sleep onset."

5      70.    Thus, in order to ensure the conversion from Ambien to Ambien CR, Sanofi

6  fraudulently marketed Ambien CR and encouraged doctors to prescribe it off-label. For

7  example, approximately four months prior to the FDA's approval of Ambien CR,

8

9  Sanofi formed an entire sales staff devoted to promoting Ambien CR to psychiatrists,

10 even though Sanofi marketing executives knew or should have known that prescription

11 of Ambien CR for psychiatric patients would be considered an off-label indication. The

12

13 July 2006 Beverly Hills sales team plan for Medi-Cal doctors notes that the pod was

14 actively inviting psychiatrists to an August 24 I:REMS program with Dr. Roth

15 organized by Sanofi.  Later, on November 29, 2006, Sanofi invited area doctors to a

16

17 lavish dinner program at the expensive Sage & Onion restaurant in Santa Barbara,

18 California to hear psychiatrist James Moghtader speak about uses for Ambien CR.  Dr.

19 Moghtader and other psychiatrists were cultivated by Sanofi to speak about off-label

20

21 uses of Ambien CR in psychiatric patients.  Sanofi provided the slides and programs for

22 these talks.

23      71.    On July 31, 2006, Sanofi sales representative Laurie Mikasa visited three

24 psychiatrists the majority of whose patients were enrolled in Medi-Cal. Her call notes

25

26 reveal that on each visit, she told the psychiatrists that Ambien CR was going to be

27 placed on the Medi-Cal formulary. Her notes also reveal that she was able to get these

28 psychiatrists to agree to prescribe their patients Ambien CR as soon as it was available

on the formulary. More specifically, one of the doctors whom Ms. Mikasa detailed was psychiatrist Tsilya Bass, who when told about the inclusion of Ambien CR on the Medi-Cal formulary, "was elated about the wonderful news and promised 10 scripts ASAP—today." A February 2007 Ambien CR tracking report lists Dr. Bass as the second highest prescriber in Mr. Hamilton's district.

## 2. Sanofi Also Secured the Conversion of Ambien Prescriptions to Ambien CR Prescriptions by Providing Kickbacks to Doctors, Nurses, and Pharmacists

72. Sanofi not only promoted Ambien CR by encouraging its prescription for off-label uses, but also used illegal kickbacks and quid pro quo to ensure that doctors, nurses, and pharmacies would switch prescriptions from Ambien to Ambien CR.

73. Federal laws and regulations governing Medicaid and similar state statutes prohibit entities such as Sanofi from providing kickbacks to physicians and medical care providers. Specifically, the Medicaid Anti-Kickback provision, 42 U.S.C. § 1320a-7b(b) (2)(B), provides:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

74. "Kickbacks" have been defined as including payments, gratuities, and other benefits paid to physicians who prescribe prescription drugs by the manufacturers of the drugs.

75. In order to encourage physicians to prescribe Ambien CR for both approved uses and for unapproved, off-label uses, Sanofi established a system in which kickbacks were regularly provided to physicians, nurses, and pharmacists. Sanofi knew that its provision of kickbacks to these physicians, nurses, and pharmacists was illegal and made efforts to conceal its illegal, fraudulent scheme. Had the United States and the several States known that these prescriptions were written due to a fraudulent kickback scheme, they would not have provided reimbursement for these prescriptions.

76. In its efforts to have doctors convert their patients with Ambien prescriptions to Ambien CR, Sanofi targeted high-prescribing doctors, their staff, and area pharmacies, providing them with kickbacks in exchange for writing prescriptions for Ambien CR. Sanofi provided these doctors, their staff, and pharmacists kickbacks in the form of participation in speakers bureaus; invitations to lavish dinners; and the provision of catered lunches, prodigious amounts of samples, and gift cards.

### (a) Speakers Bureaus

77. One way in which Sanofi encouraged physicians to write prescriptions for Ambien CR and then rewarded them for doing so was by making them members of Sanofi's "speakers bureau." Members of the speaker's bureau were trained by Sanofi to give continuing medical education talks on Ambien CR, and were paid between $1,500 and $2,000 per speaking event. Sanofi corporate policy allowed these high prescribing

1   physicians, who were selected by the marketing department to be speakers based on

2   their prescription volume, to earn up to $100,000 per year as speakers. The payments

3

4   that these doctors received were far in excess of the fair value of work they performed

5   for Sanofi.

6   78. On September 2, 2005, the day that Ambien CR was approved by the FDA,

7   Sanofi district manager Tim Miller sent sales representatives an e-mail ordering them to

8   use medical education funds to pay for speaker fees for top prescribing doctors and

9

10   lavish dinners in order to increase Ambien CR sales. Mr. Miller ordered sales

11   representatives to "target top 10 physicians weekly," indicating that the representatives

12   needed to focus their sales calls and money on the 10 highest prescribing physicians in

13

14   their territory.

15   79. On April 20, 2006, Dr. Sandeep Kapoor was paid to speak to a group of 15

16   physicians (along with 3 sales representatives) about Ambien CR at a dinner at Ruth's

17   Chris Steakhouse in Los Angeles. The dinner cost $2,480. Dr. Kapoor was considered

18

19   a high prescriber of insomnia drugs with a large population of patients who were

20   enrolled in Medi-Cal. Dr. Kapoor had informed Sanofi that he would write

21   prescriptions of Ambien CR if they made him a speaker and gave him frequent speaking

22

23   opportunities to make $1,500 to $2,00 per event. He also threatened to only write

24   Lunesta (a competing drug) prescriptions if he did not receive speaker fees from Sanofi.

25   In exchange for writing Ambien CR prescriptions, Dr. Kapoor also demanded that

26

27   Sanofi provide him with 500 doses of the flu vaccine at a time when there was a

28   shortage of the vaccine. Sanofi arranged for both the speaker status and the vaccines for

Dr. Kapoor in order to earn his Ambien CR business. Since Sanofi's speaker bureaus were closed at the time, district manager Tim Miller had to make a special request to upper management in order to have Dr. Kapoor added as a speaker.

80. On a field coaching report dated November 6, 2006, Sanofi district manager Mary DePond instructed Mr. Hamilton to tell Dr. Kapoor, "Dr. Kapoor would you attend our next Ambien CR dinner program in 2 weeks and would you continue to write Ambien CR for your patients?"

### *(b)* *Provision of Expensive Meals*

81. Sanofi also encouraged and rewarded physicians—and members of their staff—who wrote high volume prescriptions of Ambien CR by inviting them to expensive dinners, such as the one where Dr. Kapoor gave his presentation on Ambien CR, and inviting them and their staff to lunches and dinners where no presentations were made. Sanofi specifically instructed its sales representatives to target doctors the majority of whose patients were Medicaid subscribers.

82. On September 23, 2005, Sanofi district manager Tim Miller wrote an e-mail to Los Angeles sales representatives, warning them that they must visit their top prescribers, "ONCE PER WEEK," and stated that they must call on "top writers with high frequency," and take them to "lunches and dinners." Miller warned the sales representatives: "If you are not doing these steps our future meetings will not be pleasant."

83. On a draft of his October 2005 mid-year review, Stephen Hamilton noted as his accomplishments that he was having "dinners with top writers," was having

"lunches with all top writers," and "utilized over 100% of T&E budget allotted." He also noted that he was working with the psychiatry sales representatives to see the "top writers once a week" in an effort to promote Ambien off-label for psychiatric patients and to coordinate three dinner programs for doctors. His manager's comments on his mid-year review instruct Mr. Hamilton to "[k]eep the focus on the top writers, doing lunch and learns and dinners to grow these same physicians." District manager Tim Miller stated that the focus on Ambien CR sales should be with "top writers" and suggested that Mr. Hamilton do "more programs" for these physicians. "More programs" meant that Mr. Hamilton was to book more lavish dinners for physicians who were writing high volumes of Ambien and Ambien CR prescriptions in order to "gain physician time and build rapport."

84.    Indeed, Mr. Hamilton's budget was continually augmented in order for him to take physicians and nurses for dinner. During September 2005, Mr. Hamilton spent $2,047 to promote Ambien CR, mostly on meals. During October 2005, Mr. Hamilton was given $5,799 to spend, including $5,095 on Ambien CR lunches and dinners. During November 2005, he was given $3,073 to spend, including $2,591 to spend on lunches and dinners. During December 2005, he was given $2,045 to spend, including $1,604 for lunches and dinners.

85.    On October 25, 2005, Sanofi paid for a $3,000 dinner for 30 doctors, nurses and pharmacists at the Brandy Wine restaurant in Woodland Hills, California. The purpose of the dinner was to encourage the prescription of Ambien CR.

86.    On November 21, 2005, Mr. Miller wrote an e-mail to Los Angeles sales

representatives that told them not to worry about the budget, but rather to plan lunches and dinners for their top customers. Mr. Miller stated that the "basic keys to be the best district" included establishing an "excellent rapport" with physicians, which included "use of lunches and dinners," managing samples with the "bigger users," and "frequency on top writers."

87. On or about May 2006, Sanofi established that each sales representative would receive $740 per month to promote Ambien CR. District manager Mary DePond told sales representatives to "spend."

88. On or about June 2006, Sanofi issued a corporate policy on meals, entertainment and gifts for doctors that stated that sales representatives should not be attending educational dinners with physicians. The policy also stated that meals should be held at places the doctor is likely to frequent and that speakers at such dinners were not supposed to discuss any off-label uses. The policy also stated that dinners were not supposed to provide representatives with an opportunity to promote ay product or build relationship. Despite these stated policies, Sanofi district managers directed and encouraged their sales representatives to be present at educational dinners and to schedule such dinners at up-scale restaurants. In addition, Sanofi provided slides speakers for presentation at these dinners that included promotion of off-label uses. District manager Tim Miller also ordered sales representatives to take doctors for dinners in order to boost sales and "build rapport." In other words, despite Sanofi's stated policies, Sanofi was actually engaged in a pattern or practice of using lavish dinners and other gifts and incentives to encourage physicians to write prescriptions for

1  Sanofi pharmaceuticals. Upon information and belief, these practices were not isolated;

2  they were pursued nation-wide.

3

4  89.    Indeed, even after this policy was issued in June 2006, Sanofi continued to

5  encourage its sales representatives to target high prescribing physicians by providing

6  them, their nurses, and pharmacists with expensive meals.

7

8  90.    In a June 29, 2006 e-mail about "Medi-Cal strategies" for Ambien CR, Sanofi

9  sales representative Davis Fukunaga noted that he had scheduled lunch/dinners with "all

10  high MC [Medi-Cal] offices."

11

12  91.    The July 2006 Beverly Hills Sales Team's sales plan for Ambien CR noted,

13  "We have had lunches or will have had lunches with our top medical offices by July

14  15th," and "We have taken many top writers out to dinner." The plan for Medi-Cal

15  doctors also notes that, "We are actively recruiting physicians to the July 12 I:REMS

16  program with Dr. Kapoor."

17

18  92.    The 2006 Santa Barbara Business Plan for Ambien CR ordered sales

19  representatives to target the top 30 physicians with highest sedative volume and

20  "maximize key conversion resources" when calling on these doctors, including by

21  "utilize[ing] all L&L [lunch and learn] monies" on them.

22

23  93.    A July 12, 2006 flier invited physicians to an "Educational Outreach

24  Program" to "discuss current clinical issues in managing insomnia" at the expensive

25  Chapter 8 restaurant in Agoura Hills, California. The doctors were invited to discuss

26  the off-label use of Ambien CR for "comorbid psychiatric disorders." Dr. Kapoor gave

27  this presentation, for which he was paid a $2,100 speaker fee and travel expenses. The

28

1  cost of food for the 13 physicians and 4 Sanofi representatives who attended the event
2  was approximately $1,800.

4     94.    On August 3, 2006, Sanofi treated a large group of nurses to a meal at Ruth's
5  Chris Steakhouse.  The meal cost $3,228.22, and included 25 steaks, $324 worth of
6  wine, and $294 worth of cheesecakes and other desserts.  Dr. Sandeep Kapoor gave the
7  nurses a presentation on Ambien CR.  Two Sanofi sales representatives attended the
8
9  talk.  The purpose of the lavish meal and presentation was to convince the nurses to
10  help switch patients from Ambien to Ambien CR when the patients asked the doctor to
11  phone in a refill.

13            *(c)*    ***Wooing Nurses and Pharmacists***

14     95.    Indeed, one of Sanofi's strategies for switching Ambien prescriptions to
15  Ambien CR prescriptions was to focus on nurses and pharmacists.  Specifically, sales
16
17  representatives were ordered to schedule lavish dinners at high-priced restaurants for
18  nurses and pharmacists and to bring them expensive catered lunches in order to "build
19  rapport."  On September 9, 2005, for example, Tim Miller wrote an e-mail to sales
20
21  representatives ordering them to "develop pharmacy rapport for [Ambien] CR launch
22  help."

23     96.    In 2006, Sanofi sales representatives were ordered to conduct a dinner
24  program (called I:REMS) at expensive restaurants for nurses and pharmacists in order
25
26  to get their agreement to help switch patients from Ambien to Ambien CR.  Sanofi
27  provided districts with budgets for each dinner program.  The budgets established for
28  these dinners was $3,000 for a West Los Angeles dinner, $4,000 for a Beverly Hills

dinner, and \$8,000 for a Santa Barbara dinner. The August 30, 2006 dinner in Beverly Hills actually cost \$4,700, including \$1,500 for the speaker, Dr. Kapoor.

97. At a business meeting at the Hyatt Westlake hotel on or about January 17, 2007, Mary DePond told sales representatives that she and Kim Coppom, the regional director, had authorized unlimited funds to target nurses and staff of the top 10 high prescribing doctors in order to increase conversion of patients from Ambien to Ambien CR.

98. On January 28, 2007, in a field coaching report, district manager Mary DePond told Stephen Hamilton to work together with his teammates "on lunches or breakfasts to target specific high volume drs." He was also instructed to work with his counterparts "to ensure all Nursing and Pharmacy programs/monies are conducted and utilized."

99. Sales representatives were given quotas on how many nurses and pharmacists they were supposed to visit. For example, at a meeting at the Circa 55 restaurant at the Beverly Hills Hilton Hotel in January 2007, Sanofi Vice President Mike Cahill told Mr. Hamilton and other members of his district, "if we haven't taken our re-fill nurses out to lunch 9 times each, we are not doing our job." He told Sanofi sales representatives to offer nurses lunches in exchange for converting patients from Ambien to Ambien CR.

100. Sanofi also trained sales representatives to show nurses how to convert patients from Ambien to Ambien CR. Specifically, sales representatives were trained and instructed to ask nurses to switch patients from Ambien to Ambien CR when the pharmacist would call into the office about an Ambien refill. Sanofi trained its sales

1  representatives to ask nurses to authorize Ambien CR prescriptions for refills (when the

2  patient was originally prescribed Ambien) without consulting the physician. Sales

3

4  representatives were also trained and instructed to ask pharmacists to convert patients

5  from Ambien to Ambien CR directly, without phoning the physician for approval.

6  Sanofi instructed its sales representatives to provide nurses and pharmacists with

7

8  expensive meals in exchange for prescription conversions.

9  101. On July 7, 2006, Sanofi district manager Mary DePond wrote an e-mail

10 instructing sales representatives to "engage the re-fill nurses and pharmacists to assist us

11 in the conversion of Ambien to Ambien CR" because "with 60 selling days left my

12

13 concern is that if the patient doesn't have an appointment with their physician the

14 conversion opportunity will be lost!"

15 102. On September 8, 2006, Ms. DePond wrote an e-mail to Los Angeles area sales

16

17 representatives in which she instructed them to get pharmacies to push Ambien CR for

18 patients on Medi-Cal shortly after Ambien CR was accepted onto the Medi-Cal

19 formulary. The e-mail states that five pharmacies had "agreed to assist in CR

20

21 conversions for Medi-Cal and Part D patients."

22 103. An October 5, 2006 e-mail shows that Sanofi was targeting pharmacies that

23 filled high volumes of Medicaid prescriptions in order to get them to convert Ambien

24 prescriptions to Ambien CR prescriptions. The e-mail instructs sales representatives to

25

26 "[u]nderstand who are the high volume pharmacies (MediCal)" and "[d]evelop

27 relationship with Pharmacy Supervisors and Pharmacy Staff." The e-mail discusses a

28 tracking report that is meant to help sales representatives with these imperatives.

104. On or about February 11, 2007, Ms. DePond wrote a field coaching report in which she instructed Stephen Hamilton to schedule an "in-service" for all of his top 5 pharmacies. She also told him to schedule nurse and pharmacy lunches with other Sanofi sales team members.

### (d)    Sales Blitzes

105. Sanofi also periodically trained and instructed sales representatives to conduct "sales blitzes," in which high prescribing doctors would be taken to expensive dinners and their staff treated to catered lunches several times in one month. These blitzes were conducted in order to increase market share of a specific pharmaceutical product, like Ambien CR. Blitzes were often conducted during periods in which a drug was being considered for formulary status.

106. For example, the Beverly Hills sales team's Ambien CR sales plan for Medi-Cal doctors noted, "We will have a Medical [Medi-Cal] blitz with our top offices."

107. On February 16, 2007, Sanofi marketing manager Jacqueline Higgins e-mailed sales representatives to make them aware that they would have access to additional funds for expensive catered lunches and lavish dinners for use during Sanofi's National Sleep Awareness Week marketing blitz for Ambien CR. Sanofi was also providing sales representatives with pre-printed Ambien CR leave-behind items, such as pens, coffee cups, paper plates, and napkins.

108. Ms. Higgins also ordered sales representatives to include physicians, nurse practitioners, nurses, office managers and pharmacists in the blitz, noting that they each "should be elevated to equal importance to insure that Ambien CR is being prescribed

- 37 -

1 first line and that the prescription is filled."

2
3
4
5
6
7
8
9
10
11
12
13
14

109. Sanofi clearly understood that its use of kickbacks to convince physicians to convert prescriptions of Ambien to Ambien CR was illegal and encouraged sales representatives to engage in fraudulent practices to hide the kickbacks. For example, on or about October 13, 2005, at a sales meeting at PF Chang's restaurant in Beverly Hills, Tim Miller told Mr. Hamilton to add extra doctors or staff to dinner receipts "so we don't spend over $100 per doc at an event." Hamilton was instructed by another sales representative, Jonah Frisch, to purchase gifts for doctors but note the expenses down as "parking expenses." Mr. Frisch had previously worked with district manager Tim Miller, and was instructed by Mr. Miller to explain to the other sales representatives "how we do things when working for Tim Miller."

15
16
17
18
19
20
21
22
23

110. On May 5, 2006, Tim Miller sent an e-mail to sales representatives to let them know they were required to sign a compliance form stating that the company has not spent more than $2,000 on each doctor. However, Mr. Miller also later told sales representatives that they could skirt this requirement by including the names of doctors who did not actually attend high-priced dinners on the lists of attendants for those dinners. Sales representatives were also told to cater lunch for high prescribing doctors' nurses and office staff without writing the doctors' names down as the beneficiaries.

24
25
26
27

111. In addition to utilizing kickbacks in order to get physicians, nurses, and pharmacists to write and fill prescriptions for Ambien CR, Sanofi used other fraudulent means to have prescriptions for Ambien CR written.

28

*(e) Encouraging the Falsification of Treatment Authorization*

- 38 -
COMPLAINT FOR DAMAGES

*Requests*

112. Generally, a state Medicaid program will not reimburse a prescription for a pharmaceutical that is not included on the state formulary. In California and other states, however, a physician can request that Medicaid (Medi-Cal in California) cover a certain drug for a particular patient by submitting a treatment authorization request ("TAR"). In order to have Ambien CR prescribed even when it was not on the formulary, Sanofi directed and trained its sales representatives to assist physicians' offices in filling out Medicaid TARs and prior authorization forms. The instructions that Sanofi provided to physicians encouraged them to falsify information about their patients in order to have these TARs and prior authorizations ("PA") accepted.

113. For example, Sanofi prepared a sample PA form to show doctors for their patients on Medi-Cal and Medicare Part D that were subscribers of Blue Cross. Sales representatives were told to use the form to instruct doctors and their staff what justifications they should use in order to have prescriptions for Ambien CR accepted. The medical justifications on the form include: "Patient failed Ambien 10 mg: Patient continues to wake up intermittently through the night. Patient is stable on Ambien CR 12.5mg Samples [*sic*] and has not experienced any side effects." Sanofi instructed its sales representatives to encourage physicians and members of their staff to use these PAs to push through prescriptions of Ambien CR without regard as to whether their patients were actually responding well to Ambien. In other words, the sales representatives were to ask physicians to write TARs and PAs and make these representations even for patients who were responding well to Ambien.

114. The July 2006 Beverly Hills Medi-Cal Plan for Ambien CR required sales representatives to work closely with the person at each doctor's office in charge of prior authorizations to insure that Ambien CR scripts were going through.

115. A sales strategy document entitled "LA Region Compass for Retail Pharmacy Calls" instructed sales representatives to call on pharmacists to determine their willingness to put through TARs for Medi-Cal. Sanofi also invited pharmacists to lavish dinners, bought them catered lunches, and provided them with Starbucks coffees and other gifts in order to secure their assistance in manipulating the TAR program to get prescriptions of Ambien CR approved and paid.

116. On August 12, 2006, Mary DePond wrote an e-mail to sales representatives to congratulate the work of sales representative Jaime Gleason. Ms. Gleason had presented to the staff of one of the doctors she was detailing a binder showing them how to get prior authorizations for Ambien CR for their patients on Medicare Part D. She had secured the staff's assurances that they would only write Ambien CR prescriptions, and would use the binder to get PAs for Ambien CR through for their patients.

117. Sales representatives were also given a January 19, 2007 faxed dummy prescription sent through Blue Shield of California to show doctors how to write a prescription for Ambien CR that would be approved through the Blue Shield prior authorization process. The medical justification suggested by the "dummy" prior authorization is that the patient failed on Benadryl and original Ambien and was having trouble at work due to lack of sleep. The fax was to be used by Sanofi sales representatives to instruct physicians on what to write about their patients who were

1   enrolled in Blue Shield Medicaid or Medicare Part D in order to have prior
2   authorizations accepted for prescriptions of Ambien CR.   Sales representatives were
3
4   told to coach doctors and members of their staff to use these medical justifications even
5   if they were not in fact true.

6   118.   Upon information and belief, physicians and members of their staff, following
7   the instructions of Sanofi sales representatives, actually falsified TARs and PAs in order
8
9   to get prescriptions for Ambien CR authorized for payment. Likewise, pharmacists also
10  aided in having such false TARs and PAs approved. Had Medicaid/Medi-Cal and the
11  Medicare Part D program known that these TARs and PAs, respectively, were false,
12
13  neither the federal government nor the State would have reimbursed for these
14  prescriptions.

15  119.   By training and instructing physicians on fraudulent ways in which to have
16
17  TARs and PAs approved that otherwise would not be accepted by Medicaid and
18  Medicare Part D, Sanofi caused the fraudulent submission of claims to Medicaid, Medi-
19  Cal, other state Medicaid programs, and Medicare Part D.  Moreover, upon information
20  and belief, this scheme to encourage the fraudulent submission of TARs and PAs was
21
22  not limited to the California region; Sanofi pursued this scheme nationwide.

23  120.   Sanofi's goal in encouraging the widespread use of TARs and prior
24  authorization requests was two-fold.  First, Sanofi sought to make claims on Medicaid
25
26  and Medicare Part D that otherwise would not be eligible for reimbursement.  Second,
27  the number of TARs received by state Medicaid programs directly influences whether a
28  pharmaceutical is placed on a state's formulary.  Thus, by encouraging physicians to

1  and pharmacists submit false TARs, Sanofi sought unlawfully and fraudulently to

2  influence Medicaid state programs to place Ambien CR on state formularies.

3

4  *(f)* **Encouraging Double Billing and Fraudulent Billing**

5  121. Sanofi also pursued a scheme to encourage doctors to engage in double

6  billing. Pursuant to this scheme, doctors were told to write out two prescriptions for

7
8  their patients on certain managed care formulary plans, including some Medicaid and

9  Medicare Part D formulary plans. Because these plans called for a patient to fail on

10  Ambien prior to being prescribed Ambien CR, sales representatives were trained and

11  instructed to tell doctors to prescribe both an Ambien prescriptions and an Ambien CR
12
13  prescription. Sanofi marketing executives created this marketing program because they

14  knew that many patients do not need a second prescription of drugs for insomnia, so

15  they do not go back to refill a prescription once they have taken an initial prescription of
16
17  Ambien or failed on an initial prescription of Ambien. By encouraging doctors to write

18  two prescriptions, Sanofi sought to cause double billings and billings for drugs that

19  were not necessary and would not be used.

20
21  122. A visual aid that the sales representatives were to use to promote this scheme

22  says, "two prescriptions (generic and Ambien CR) may be appropriate for some patients

23  to obviate the need for a return visit due to therapy failure."

24  *(g)* **Sanofi's Illegal Practices Caused Physicians and Nurses to Write**
25  **Prescriptions for Ambien CR**

26  123. Sales representatives were therefore encouraged to use whatever means

27  necessary in order to ensure conversions from Ambien to Ambien CR. This campaign
28

1    to convert sales was a priority for Sanofi: the company began to award sales
2    representatives their bonuses based solely on their "conversion rates." In other words,
3
4    Sanofi tracked the prescription writing habits of all the physicians detailed by their sales
5    representatives. Sanofi then measured the rates at which each sales representative was
6    able to convert Ambien prescriptions to Ambien CR prescriptions. Part of each
7    representative's bonus was based on this ability to convert prescriptions.
8

9    124. A December 2005 Incentive Compensation Scorecard for Mr. Hamilton
10   indicates that $6,175 of his $8,284 bonus for the fourth quarter was due to the
11   conversion of Ambien prescriptions to Ambien CR prescriptions in his territory. By
12
13   contrast, prior to introduction of Ambien CR, in 2004, sales bonuses were based on
14   prescription volume, rather than patient conversions.

15   125. A June 2006 Sanofi document that explained the new bonus plan was called a
16
17   "Forced Ranking plan based on CR Conversion Rates." The document described the
18   percentage of patients that would need to be converted from Ambien to Ambien CR in
19   order for sales representatives to earn their bonus levels. The document stated that the
20   "most successful Sales Professionals will be those who aggressively convert both
21
22   Competitor and IR [original Ambien] Rxs to [Ambien] CR."

23   126. The fact that Sanofi was able to track conversion rates illustrates that
24   physicians did in fact change their prescribing practices due to Sanofi's off-label
25
26   promotions and use of kickbacks. To put it differently, Sanofi's efforts to promote off-
27   label uses of Ambien CR and its provision of kickbacks to physicians actually caused
28   physicians to write prescriptions of Ambien CR and to change prescriptions of Ambien

1 | to prescriptions for Ambien CR.

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

127. Sanofi not only tracked conversion rates, but also "Return on Investment," tracking physicians' prescribing practices after their attendance at lavish dinners, or after blitzes in which they were targeted for several dinners and lunches. Indeed, high percentages of the patient populations of physicians targeted by Sanofi were Medicaid subscribers. Sanofi tracked the prescription-writing practices of these doctors and clearly believed that Sanofi's efforts to induce these doctors to write prescriptions, including for off-label uses, worked. The tracking documents show that physicians wrote prescriptions for their Medicaid clients; that the prescriptions were influenced by kickbacks; and that more likely than not, many of the prescriptions were for off-label purposes. Moreover, upon information and belief, these prescriptions were actually billed to Medicaid and/or Medicare Part D. Thus, Sanofi's pattern and practice of promoting off-label uses of their drugs and providing kickbacks to physicians to write prescriptions actually led to the submission of false claims to the federal government and the several states.

20
21

**D.    Sanofi Also Utilized Kickbacks to Promote Ambien**

22
23
24
25

128. Sanofi did not promote only Ambien CR by using kickbacks. Prior to Ambien CR, Sanofi also promoted Ambien by employing a program that provided illegal rewards to doctors for writing Ambien prescriptions.

26
27
28

129. For example, Sanofi scheduled lavish dinners for physicians to encourage them to write Ambien prescriptions. An October 2003 Monthly Marketing Report by Sanofi district manager Nancy Reid stated that a Sanofi representative met several times

with a Dr. Raskin "to help him prepare his first lecture" on prescribing Ambien. Reid wrote that after the talk, Sanofi sales representatives would be tracking the doctors that attended the event in order to ensure that they were writing prescriptions for Ambien. Id. Again, on or about February 23, 2004, Dr. Damon Raskin was spoke about Ambien at a dinner for physicians at Lawry's restaurant in Beverly Hills.

130. In a September 16, 2003 3-mail, Mr. Hamilton noted that the LA sales team had "3 Ambien dinner programs scheduled at Lawry's in Beverly Hills," and that Dr. Raskin would be the speaker. The sales representatives were to invite "key Ambien writers" and members of formulary committees to the dinners. The e-mail stated that "Lawry's is a 5-star fine dining establishment that serves prime rib and has a quiet private room."

131. Sanofi also provided meals for members of doctors' staff. For example, on April 15, 2004, Sanofi paid \$235 for a catered lunch at Dr. David McDonough's office after Dr. McDonough told Sanofi sales representatives that he would only prescribe Ambien if they brought catered lunches to his offices.

132. Similarly, Dr. Kenneth Nyman told Mr. Hamilton and another sales representative, Magdalena Kita, that he would write prescriptions for Ambien CR if they would bring him lunch. He explained that his kitchen was being remodeled, so he could not cook at home. He promised 20 new prescriptions of Ambien CR in exchange for lunches and dinners. He asked Mr. Hamilton and Ms. Kita to drop off lunch at his house. Additionally, on October 18, 2005, Mr. Hamilton expensed a \$270 dinner for 10 people for Dr. Nyman's office. On December 22, 2005, he expensed \$290 for Dr.

Nyman for 20 people in his office. Upon information and belief, Dr. Nyman took all or part of this food to be eaten at his home.

133. Likewise, Dr. Richard Ellenbogan told Mr. Hamilton and Ms. Kita that he would write Ambien CR prescriptions if they brought him lunch. Mr. Hamilton expensed lunches on November 22, 2005 for $257 and on December 13, 2005 for $183 for Dr. Ellenbogan and his staff.

134. Sanofi also conducted sales blitzes for Ambien, spending exorbitant amounts of money in short periods in order to encourage doctors to write prescriptions. For example, in a November 12, 2004 mid-year review of Mr. Hamilton, Sanofi district manager Rodney Carr wrote that Hamilton had been involved in doctor blitzes by "helping partners invite physicians to programs, targeting appropriate offices for lunches, and blitzing appropriate physicians for specific products. Carr also wrote that Mr. Hamilton should "focus on high-volume Medi-Cal physicians."

135. Finally, Sanofi also set up speakers' bureaus and advisory boards for doctors, which allowed Sanofi to funnel money to doctors in exchange for prescriptions.

136. For example, on January 4, 2005, Sanofi district manager Rodney Carr instructed sales representatives to each "recruit three physicians" to join Sanofi clinical advisory boards.

137. In January 2005, Mr. Carr directed Mr. Hamilton to invite psychiatrists to attend a clinical advisory board dinner program on the use of Ambien facilitated by psychiatrist Milton Erman. Attendees were paid $300 each to attend the dinner.

138. The physicians targeted by Sanofi actually wrote prescriptions and submitted

them to Medicaid as a result of kickbacks Sanofi provided to them. The Medicaid Anti-Kickback statute is a critical provision of Medicaid. Thus, compliance with it is material to the government's treatment of claims for reimbursement. Had the United States and the several States known that these physicians wrote Medicare and Medicaid prescriptions for Ambien and Ambien CR because the physicians had been paid kickbacks by Sanofi to do so, the United States and the several States would not have provided reimbursement for these prescriptions. To do so would put the government in the position of funding illegal kickbacks after the fact.

139. Moreover, the kickbacks described in this complaint are strictly illegal and have had the direct effect of greatly increasing the amount of Ambien and Ambien CR prescriptions written and have had the indirect effect of increasing the amount of money spent by the federal government and the States for reimbursement of prescriptions covered by Medicaid and Medicare Part D. The payment of these kickbacks represents the inducement of payments through a pattern of fraudulent conduct and constitutes false claims within the meaning of 31 U.S.C. § 3729 and the relevant provisions of the state false claims and Medicaid fraud statutes.

## COUNT ONE

### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR CAUSING SUBMISSION OF OFF-LABEL PRESCRIPTIONS (31 U.S.C. §3729)

140. Relator re-alleges and incorporates the allegations in paragraphs 1- 139 as if fully set forth herein.

141. By presenting physicians with false information about off-label uses of its

pharmaceuticals and encouraging physicians to write prescriptions for such uses which were not approved by the FDA or any relevant drug compendium, Sanofi-Aventis caused physicians to submit numerous prescriptions for Ambien, Ambien CR, Uroxatral and Plavix that were ineligible for reimbursement under Medicaid and/or Medicare Part D because they were prescribed for an off-label use. Thus, Sanofi knowingly caused such physicians and pharmacists expressly or impliedly to make false certifications about the pharmaceuticals' indications and efficacy, both in the writing of prescriptions for off-label uses of Ambien, Ambien CR, Uroxatral and Plavix and in preparing false and fraudulent prior authorizations and treatment authorization requests. Sanofi therefore caused the submission of false claims for payment of money under the federal Medicaid and Medicare Part D program. Had the United States known that the prescriptions Sanofi caused to be written were for unapproved, off-label uses, and had it known that the information on prior authorizations and TARs had been falsified, the United States would not have provided reimbursement for such prescriptions under its Medicaid and Medicare Part D plans.

142. This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

143. The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

1

2

3

4

## COUNT TWO
### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR CAUSING FRAUDULENT SUBMISSION OF PRESCRIPTIONS T HROUGH TREATMENT AUTHORIZATION REQUESTS AND PRIOR AUTHORIZATIONS  (31 U.S.C. §3729)

5

6

144.   Relator re-alleges and incorporates the allegations in paragraphs 1- 143 as if fully set forth herein.

7

8

9

10

11

12

13

14

15

16

17

18

145.   By training and encouraging physicians to have prescriptions approved for Ambien CR by falsifying information on treatment authorization requests and prior authorizations, Sanofi-Aventis caused physicians to submit numerous prescriptions for Ambien CR that were ineligible for reimbursement under Medicaid and/or Medicare Part D because had the true patient information been provided on these forms, the treatment authorization requests and prior authorization requests would never have been granted.  Sanofi knowingly caused such physicians and pharmacists expressly to make false certifications about whether their patients qualified to receive prescriptions for Ambien CR.

19

20

21

22

146.   Had the United States known that the information on prior authorizations and TARs had been falsified, the United States would not have provided reimbursement for such prescriptions under its Medicaid and Medicare Part D plans.

23

24

147.   This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

25

26

27

28

148.   The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

## COUNT THREE

## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR SANOFI'S FRAUDULENT PROMOTION OF AMBIEN CR (31 U.S.C. §3729)

149.  Relator re-alleges and incorporates the allegations in paragraphs 1- 148 as if fully set forth herein.

150.  Sanofi represented to doctors, pharmacists, nurses, and others that Ambien CR was as effective as Ambien.  Such representations were false and fraudulent.  However, relying on these false representations, physicians changed their patients' Ambien prescriptions for Ambien CR.

151.  In many instances, Ambien CR was more costly than Ambien.  As such, for Medicaid and Medicare Part D patients, the federal government was forced to pay for the more costly Ambien CR prescriptions that were neither more effective nor better tolerated than prescriptions for Ambien would have been.

152.  This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

153.  The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

## COUNT FOUR

## SANOFI'S SCHEME WITH RESPECT TO OFF-LABEL PRESCRIPTIONS AS CONSPIRACY TO SUBMIT FALSE CLAIMS, 31 U.S.C. § 3729(A)(3)

154.  Relator re-alleges and incorporates the allegations in paragraphs 1- 153 as if

1  fully set forth herein.

2  155. Sanofi combined, conspired, and agreed together with physicians, nurses,
3
4  pharmacists, and others to defraud the United States by knowingly causing false claims
5  to be submitted to the United States for the purpose of having those claims paid and
6  ultimately profiting from those false claims. Sanofi committed other overt acts set forth
7
   above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(3),
8
9  causing damage to the United States.

10
                              **COUNT FIVE**
11
   **FEDERAL FALSE CLAIMS ACT VIOLATIONS BASED ON THE PAYMENT**
12                    **OF KICKBACKS (31 U.S.C. §3729)**
13
14  156. Relator re-alleges and incorporates the allegations in paragraphs 1- 155 as if
15  fully set forth herein.

16  157. Sanofi's payment of kickbacks to physicians and pharmacists violated the
17
   Medicaid Anti-Kickback statute and caused false claims to be submitted to the federal
18
19  government.    Since the Medicaid Anti-Kickback statue is a critical provision of
20  Medicaid, compliance with it is material to the government's treatment of claims for
21  reimbursement. Had the United States and the several states known that Medicaid and
22
23  Medicare Part D prescriptions for Ambien and Ambien CR had been written because
24  physicians had been paid kickbacks by Sanofi to do so, the United States would not
25  have provided reimbursement for these prescriptions.    As the United States was
26
   unaware of the illegality of the claims, and in reliance on the accuracy and legality
27
28  thereof, made payment upon the false or fraudulent claims, the United States was

1 damaged.

2
3    158. The kickbacks described herein are strictly illegal and have had the direct

4 effect of greatly increasing the amount of Ambien and Ambien CR prescriptions and the

5 indirect effect of increasing the amount of money spent by the federal government for

6 reimbursement of prescriptions covered by Medicaid. The payment of these kickbacks

7
8 represents the inducement of federal payments through a pattern of fraudulent conduct

9 and constitutes false claims within the meaning of 31 U.S.C. § 3729.

10                                    **COUNT SIX**

11
## SANOFI'S PAYMENT OF KICKBACKS AS CONSPIRACY TO SUBMIT
12 ## FALSE CLAIMS, 31 U.S.C. § 3729(A)(3)

13    159. Relator re-alleges and incorporates the allegations in paragraphs 1- 158 as if

14 fully set forth herein.
15

16    160. Sanofi combined, conspired, and agreed together with physicians,

17 pharmacists, nurses, and others to defraud the United States by knowingly causing false

18 and illegal claims to be submitted to the United States for the purpose of having those
19
20 claims paid and ultimately profiting from those false claims. Sanofi committed other

21 overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C.

22 § 3729(a)(3), causing damage to the United States.

23

24

25    **PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

26       Relator respectfully requests this Court to enter judgment against defendants, as
27
28 follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)     That civil penalties of $10,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f)     That this Court award such other and further relief as it deems proper.

## COUNT SEVEN

## VIOLATION OF THE ARKANSAS MEDICAID FRAUD FALSE CLAIMS ACT

161.   Relator re-alleges and incorporates the allegations in paragraphs 1- 159 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in the State of Arkansas. Upon information and belief, Sanofi's actions described herein occurred in the State of Arkansas as well.

162. This is a qui tam action brought by Relator and the Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

163. The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who-

> Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

> At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

164. In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

> Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

165. Sanofi violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) (2) & (7)(A) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

166. Sanofi furthermore violated Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and

presented to Arkansas from at least 2001 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act and Stark Act Requirements, as described herein.

167. Arkansas, by and through the Arkansas Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

168. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Arkansas is connection with Sanofi's fraudulent and illegal practices.

169. Had the Arkansas known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

170. As a result of Sanofi's violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

171. Mr. Hamilton is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of himself and the State of Arkansas.

172. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid

1    program.

2
3    173. WHEREFORE, Relator respectfully requests this Court to award the
4    following damages to the following parties and against Sanofi:

5    To the STATE OF ARKANSAS:

6     Three times the amount of actual damages which the State of Arkansas has
7     sustained as a result of Sanofi's fraudulent and illegal practices;
8

9     A civil penalty of not less than $5,000 and not more than $10,000 for each false
10     claim which Sanofi caused to be presented to the State of Arkansas;
11

12     Prejudgment interest; and
13

14     All costs incurred in bringing this action.
15

16    To RELATOR:

17     The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any
18     other applicable provision of law;
19

20     Reimbursement for reasonable expenses which Relator incurred in connection
21     with this action;
22

23     An award of reasonable attorneys' fees and costs; and
24

25     Such further relief as this court deems equitable and just.
26

27

28

1

## **COUNT EIGHT**

2
3

## **VIOLATON OF THE CALIFORNIA FALSE CLAIMS ACT (Cal. Gov't Code § 12650 et seq.)**

4
5
6

174. Relator re-alleges and incorporates the allegations in paragraphs 1- 173 as if fully set forth herein.

7

175. This is a qui tam action brought by Relator and the State of California to

8

recover treble damages and civil penalties under the California False Claims Act, Cal.

9
10

Gov't. Code § 12650 *et seq.*

11

176. Cal. Gov't Code § 12651(a) provides liability for any person who—

12
13
14
15

Knowingly presents, or causes to be presented, to an officer or employee of the state of any political division thereof, a false claim for payment or approval;

16
17
18
19

Knowingly makes, uses, or causes to be made or used a false record of statement to get a false claim paid or approved by the state or by any political subdivision;

20
21
22

Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state of by any political subdivision.

23
24
25
26
27

Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

28

177. In addition, the payment or receipt of bribes or kickbacks is prohibited under

Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

178. Sanofi violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

179. Sanofi furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2001 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as described herein.

180. The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

181. Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Sanofi's fraudulent and illegal practices.

182. Had the State of California known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

183. As a result of Sanofi's violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

184. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

185. This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

186. WHERFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF CALIFORNIA:

Three times the amount of actual damages which the State of California has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of up to $10,000 for each false claim which Sanofi presented or caused to be presented to the State of California;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT NINE

## VIOLATION OF THE DELAWARE FALSE AND REPORTING CLAIMS ACT

187.  Relator re-alleges and incorporates the allegations in paragraphs 1- 186 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the State of Delaware.  Upon information and belief, Sanofi's actions described herein occurred in Delaware as well.

188.  This is a qui tam action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 et seq.

189.  6 Del. C. § 1201 et seq. provides liability for any person who—

Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit money or property to or from the Government

190.    Further, 31 Del. C. § 1005 provides that—

It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

191.    Sanofi violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from 2001 to the present by its violation of federal and state laws, including 31 Del. C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as described herein.

192.    The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

193.    Compliance with applicable Medicare, Medicaid and the various other federal

and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Sanofi's fraudulent and illegal practices.

194.   Had the State of Delaware known that Sanofi was violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

195.   As a result of Sanofi's violations of 6 Del C. § 1201(a), the State of Delaware has been damage in an amount far in excess of millions of dollars exclusive of interest.

196.   Sanofi did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

197.   Mr. Hamilton is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

198.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

199.   WHEREFORE, Relator respectfully requests this Court to award the

following damages to the following parties against Sanofi:

To the STATE OF DELAWARE:

Three times the amount of actual damages which the State of Delaware has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty on not less then $5,500 and not more than $ 11,000 for each false claim which Sanofi caused to be presented to the State of Delaware;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to 6 Del C. § 1205,and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT TEN

## VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

200. Relator re-alleges and incorporates the allegations in paragraphs 1- 199 as if

fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in the District of Columbia. Upon information and belief, Sanofi's actions described herein occurred in the District of Columbia as well.

201. This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et seq.

202. D.C. Code § 2-30814(a) provides liability for any person who-

> Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

> Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

> Conspires to defraud the District by getting a false claim allowed or paid by the District;

> Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

203. In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or

Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

204.  Sanofi violated D. C. Code § 4-802(c) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

205.  Sanofi furthermore violated D. C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia from at least 2001 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act, as described herein.

206.  The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

207.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia is connection with Sanofi's fraudulent and illegal practices.

208.  Had the District of Columbia known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care

providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

209. As a result of Sanofi's violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

210. Mr. Hamilton is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

211. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

212. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the DISTRICT OF COLUMBIA:

Three times the amount of actual damages which the District of Columbia has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the District of Columbia;

Prejudgment interest; and

1   All costs incurred in bringing this action.

2

3   To RELATOR:

4   The maximum amount allowed pursuant to D. C. Code § 2-308.15(f) and /or any
5   other applicable provision of law;

6

7   Reimbursement for reasonable expenses which Relator incurred in connection with
8   this action;

9

10  An award of reasonable attorneys' fees and costs; and

11

12  Such further relief as this court deems equitable and just.

13

14  ## COUNT ELEVEN

15  ## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

16  213.  Relator re-alleges and incorporates the allegations in paragraphs 1- 212 as if

17  fully set forth herein. Additionally, Relator states that upon information and belief, the

18  course of conduct described in this Complaint took place not only in Relator's region of

19  California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the

20

21  State of Florida.  Upon information and belief, Sanofi's actions described herein

22  occurred in the State of Florida as well.

23  214.  This is a qui tam action brought by Relator and the State of Florida to recover

24

25  treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. §

26  68.081 et seq.

27  215.  West's F.S.A. § 68.082 provides liability for any person who-

28

1    Knowingly presents or causes to be presented to an officer or employee of
2    an agency a false claim for payment or approval

4    Knowingly makes, uses, or causes to be made or used a false record or
5    statement to get a false or fraudulent claim paid or approved by an agency

7    Conspires to submit a false claim to an agency or to deceive an agency for
8    the purpose of getting a false or fraudulent claim allowed or paid

216.   Sanofi violated West's F.S.A. § 68.082 from at least 2001 to the present by
engaging in the fraudulent and illegal practices described herein.

217.   Sanofi furthermore violated West's F.S.A. § 68.082 and knowingly caused
thousands of false claims to be made, used and presented to the State of Florida from at
least 2001 to the present by its violation of federal and state laws, including the Anti-
Kickback Act, and the Stark Act, as described herein.

218.   The State of Florida, by and through the State of Florida Medicaid program
and other state health care programs, and unaware of Sanofi's fraudulent and illegal
practices, paid the claims submitted by health care providers and third payers in
connection therewith.

219.   Compliance with applicable Medicare, Medicaid and the various other federal
and state laws cited herein was an implied, and upon information and belief, also an
express condition of payment of claims submitted to the State of Florida in connection
with Sanofi's fraudulent and illegal practices.

220.   Had the State of Florida known that Sanofi was violating the federal and state

laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

221. As a result of Sanofi's violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

222. Mr. Hamilton is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to West's F.S.A. § 68.083(2) on behalf of himself and the State of Florida.

223. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

224. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF FLORIDA:

Three times the amount of actual damages which the State of Florida has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the State of Florida;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to West's F.S.A. § 68.085 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT TWELVE

### VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT

225.   Relator re-alleges and incorporates the allegations in paragraphs 1- 224 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the State of Georgia.   Upon information and belief, Sanofi's actions described herein occurred in Georgia as well.

226.   This is a qui tam action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168  *et seq.*

227.   Ga. Code Ann. § 49-4-168.1 *et seq.* provides liability for any person who—

Knowingly presents or causes to be presented to the Georgia Medicaid

1  program a false or fraudulent claim for payment or approval;

2  Knowingly makes, uses, or causes to be made or used, a false record or
3  statement to get a false or fraudulent claim paid or approved by the Georgia
4  Medicaid program;

5  Conspires to defraud the Georgia Medicaid program by getting a false or
   fraudulent claim allowed or paid;
6

7  Knowingly makes, uses, or causes to be made or used, a false record or
   statement to conceal, avoid, or decrease an obligation to pay, repay or
8  transmit money or property to the State of Georgia.

9  228.  Sanofi violated Ga. Code Ann. § 49-4-168.1 and knowingly caused hundreds

10 of thousands of false claims to be made, used and presented to the State of Georgia

11
   from 2001 to the present by its violation of federal and state laws, including the Anti-
12

13 Kickback Act and the Stark Act, as described herein.

14 229.  The State of Georgia, by and through the Georgia Medicaid program and other

15 state health care programs, and unaware of Sanofi's fraudulent and illegal practices,
16
   paid the claims submitted by health care providers and third party payers in connection
17

18 therewith.

19 230.  Compliance with applicable Medicare, Medicaid and the various other federal
20
   and state laws cited herein was an implied, and upon information and belief, also an
21

22 express condition of payment of claims submitted to the State of Georgia in connection

23 with Sanofi's fraudulent and illegal practices.

24
   231.  Had the State of Georgia known that Sanofi was violating the federal and state
25

26 laws cited herein, it wound not have paid the claims submitted by health care providers

27 and third party payers in connection with Sanofi's fraudulent and illegal practices.

28 232.  As a result of Sanofi's violations of Ga. Code Ann. § 49-4-168.1, the State of

Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

233.   Sanofi did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

234.   Mr. Hamilton is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of himself and the State of Georgia.

235.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

236.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties against Sanofi:

To the STATE OF GEORGIA:

Three times the amount of actual damages which the State of Georgia has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty on not less then $5,500 and not more than $ 11,000 for each false claim which Sanofi caused to be presented to the State of Georgia;

1    Prejudgment interest; and

2

3    All costs incurred in bringing this action.

4

5    To RELATOR:

6    The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i),and /or

7    any other applicable provision of law;

8

9    Reimbursement for reasonable expenses which Relator incurred in connection with

10   this action;

11

12   An award of reasonable attorneys' fees and costs; and

13

14   Such further relief as this Court deems equitable and just.

15

16   ## COUNT THIRTEEN

17   ## VIOLATION OF THE HAWAII FALSE CLAIMS ACT

18   237.   Relator re-alleges and incorporates the allegations in paragraphs 1- 236 as if

19   fully set forth herein. Additionally, Relator states that upon information and belief, the

20   course of conduct described in this Complaint took place not only in Relator's region of

21

22   California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the

23   State of Hawaii.   Upon information and belief, Sanofi's actions described herein

24   occurred in Hawaii as well.

25

26   238.   This is a qui tam action brought by Relator and the State of Hawaii to recover

27   treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat.

28   § 661.21 et seq.

239.  Haw. Rev. Stat. § 661-21(a) provides liability for any person who—

Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

240.  Sanofi violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

241.  The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

242.  Compliance with applicable Medicare, Medicaid and the various other federal state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Hawaii in connection with Sanofi's fraudulent and illegal practices.

243. Had the State of Hawaii known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

244. As a result of Sanofi's violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

245. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

246. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

247. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF HAWAII:

Three times the amount of actual damages which the State of Hawaii has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the State of Hawaii;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT FOURTEEN

### VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

248. Relator re-alleges and incorporates the allegations in paragraphs 1- 247 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in the State of Illinois. Upon information and belief, Sanofi's actions described herein occurred in Illinois as well.

249. This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and

1 Protection Act, 740 ILCS 175 *et seq*.

2 250. 740 ILCS 175/3(a) provides liability for any person who—
3

4 knowingly presents, or causes to be presented, to an officer or employee of
5 the State of a member of the Guard a false or fraudulent claim for payment
6 or approval;

7 knowingly makes, uses, of causes to be made or used, a false record or
8 statement to get a false or fraudulent claim paid or approved by the State;
9 Conspires to defraud the State by getting a false or fraudulent claim
10 allowed or paid.

11

12 251. In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor
13 Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration,
14 including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in
15
16 cash or in kind in return for furnishing any item of service for which payment may be
17 made in whole or in part under the Illinois Medicaid program.

18 252. Sanofi violated 305 ILCS 5/8A-3(b) from at least 2001 to the present by
19 engaging in the fraudulent and illegal practices described herein.
20

21 253. Sanofi furthermore violated 740 ILCS 175/3(a) and knowingly caused
22 hundreds of thousands of false claims to be made, used and presented to the State of
23 Illinois from at least 2001 to the present by its violation of federal and state laws,
24
25 including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as described
26 herein.

27 254. The State of Illinois, by and through the Illinois Medicaid program and other
28 state health care programs, and unaware of Sanofi's fraudulent and illegal practices,

paid the claims submitted by health care providers and third party payers in connection therewith.

255.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Sanofi's fraudulent and illegal practices.

256.   Had the State of Illinois known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

257.   As a result of Sanofi's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

258.   Mr. Hamilton is a private person with direct and independent knowledge of the allegation of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

259.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

260.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF ILLINOIS:

Three times the amount of actual damages which the State of Illinois has

1 sustained as a result of Sanofi's fraudulent and illegal practices;

3 A civil penalty of not less than $5,000 and not more than $10,000 for each false
4 claim which Sanofi caused to be presented to the State of Illinois;

6 Prejudgment interest; and

8 All costs incurred in bringing this action.

10 To RELATOR:

11 The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other
12 applicable provision of law;

14 Reimbursement for reasonable expenses which Relator incurred in connection
15 with this action;

17 An award of reasonable attorneys' fees and costs; and

19 Such further relief as this Court deems equitable and just.

20 **COUNT FIFTEEN**

21 **VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER**
22 **PROTECTION ACT**

23 261.  Relator re-alleges and incorporates the allegations in paragraphs 1- 260 as if

24 fully set forth herein. Additionally, Relator states that upon information and belief, the

25 course of conduct described in this Complaint took place not only in Relator's region of
26

27 California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the

28 State of Indiana.   Upon information and belief, Sanofi's actions described herein

1 | occurred in Indiana as well.

2
3 | 262.   This is a qui tam action brought by Relator and the State of Indiana to recover
4 | treble damages and civil penalties under the Indiana False Claims and Whistleblower
5 | Protection Act, IC 5-11-5.5 *et seq*.

6
7 | 263.   IC 5-11-5.5-2 provides liability for any person who—

8 | (1) presents a false claim to the state for payment or approval;
9

10 | (2) makes or uses a false record or statement to obtain payment or approval
11 | of a false claim from the state;

12

13 | (3) with intent to defraud the state, delivers less money or property to the
14 | state than the amount recorded on the certificate or receipt the person
15 | receives from the state;

16

17 | (4) with intent to defraud the state, authorizes issuance of a receipt without
18 | knowing that the information on the receipt is true;

19

20 | (5) receives public property as a pledge of an obligation on a debt from an
21 | employee who is not lawfully authorized to sell or pledge the property;

22

23 | (6) makes or uses a false record or statement to avoid an obligation to pay or
24 | transmit property to the state;

25

26 | (7) conspires with another person to perform an act described in subdivisions
27 | (1) through (6); or

28

1  (8) causes or induces another person to perform an act described in

2  subdivisions (1) through (6).

3
4  264.   In addition, IC 12-15-24-1 & IC 12-15-24-2 prohibits the provision of a

5  kickback or bribe in connection with the furnishing of items or services or the making

6  or receipt of the payment under the Indiana Medicaid program.

7  265.   Sanofi violated IC 12-15-24-1 & IC 12-15-24-2 from at least 2001 to the

8
9  present by engaging in the fraudulent and illegal practices described herein.

10  266.   Sanofi furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of

11  thousands of false claims to be made, used and presented to the State of Indiana from at

12
13  least 2001 to the present by its violation of federal and state laws, including IC 12-15-

14  24-1 & IC 12-15-24-2, the Anti-Kickback Act and the Stark Act, as described herein.

15  267.   The State of Indiana, by and through the Indiana Medicaid program and other

16  state health care programs, and unaware of Sanofi's fraudulent and illegal practices,

17
18  paid the claims submitted by health care providers and third party payers in connection

19  therewith.

20  268.   Compliance with applicable Medicare, Medicaid and the various other federal

21  and state laws cited herein with an implied, and upon information and belief, also an

22
23  express condition of payment of claims submitted to the State of Indiana in connection

24  with Sanofi's fraudulent and illegal practices.

25  269.   Had the State of Indiana known that Sanofi was violating the federal and state

26  laws cited herein, it would not have paid the claims submitted by health care providers

27
28  and third party payers in connection with Sanofi's fraudulent and illegal practices.

270.   As a result of Sanofi's violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

271.   Mr. Hamilton is a private person with direct and independent knowledge of the allegation of this Complaint, who has brought this action pursuant to IC 5-11-5.5-4 on behalf of himself and the State of Indiana.

272.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

273.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF INDIANA:

Three times the amount of actual damages which the State of Indiana has sustained as a result of Sanofi's fraudulent and illegal practices;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT SIXTEEN

## VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

274.   Relator re-alleges and incorporates the allegations in paragraphs 1- 273 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the State of Louisiana.  Upon information and belief, Sanofi's actions described herein occurred in Louisiana as well.

275.   This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.

276.   La. Rev. Stat. Ann. § 438.3 provides –

No person shall knowingly present or cause to be presented a false or fraudulent claim;

No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medial assistance programs funds;

No person shall conspire to defraud, or attempt to defraud, the medical

assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

277.   In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

278.   Sanofi violated La. Rev. Stat. Ann § 438.2(A) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

279.   Sanofi furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 2001 to the present by its violation of federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act and Stark Act, as described herein.

280.   The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

281.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Sanofi's fraudulent and illegal practices.

282. Had the State of Louisiana known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi'ss fraudulent and illegal practices.

283. As a result of Sanofi's violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

284. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of himself and the State of Louisiana.

285. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

286. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF LOUISIANA:

Three times the amount of actual damages which the State of Louisiana has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the State of Louisiana;

1    Prejudgment interest; and

2

3    All costs incurred in bringing this action.

4

5    To RELATOR:

6    The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any

7    other applicable provision of law;

8

9    Reimbursement for reasonable expenses which Relator incurred in connection

10   with this action;

11

12   An award or reasonable attorneys' fees and costs; and

13

14   Such further relief as this Court deems equitable and just.

15

16                          **COUNT SEVENTEEN**

17      **VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT**

18   287.   Relator re-alleges and incorporates the allegations in paragraphs 1- 286 as if

19   fully set forth herein. Additionally, Relator states that upon information and belief, the

20   course of conduct described in this Complaint took place not only in Relator's region of

21

22   California, but was a nationwide practice of Sanofi. Sanofi conducts business in the

23   Commonwealth of Massachusetts.   Upon information and belief, Sanofi's actions

24   described herein occurred in Massachusetts as well.

25

26   288.   This is a qui tam action brought by Relator and State of Massachusetts for

27   treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws

28

Ann. Chap 12 § 5(A) et seq.

289.   Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person who—

Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

Is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reason able time after discovery of the false claim.

290.   In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe ore rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

291.   Sanofi violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

292.   Sanofi furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented

1    to the State of Massachusetts from at least 2001 to the present by its violation of federal

2    and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41, the Anti-Kickback

3

4    Act and the Stark Act, as described herein.

5    293.    The State of Massachusetts, by and through the Massachusetts Medicaid

6    program and other state health care programs, and unaware of Sanofi's fraudulent and

7

8    illegal practices, paid the claims submitted by health care providers and third party

9    payers in connection therewith.

10    294.    Compliance with applicable Medicare, Medicaid and the various other federal

11    and state laws cited herein was an implied, and upon information and belief, also an

12

13    express condition of payment of claims submitted to the State of Massachusetts in

14    connection with Sanofi's fraudulent and illegal practices.

15    295.    Had the State of Massachusetts known that Sanofi was violating the federal

16    and state laws cited herein, it would not have paid the claims submitted by health care

17    providers and third party payers in connection with Sanofi's fraudulent and illegal

18

19    practices.

20    296.    As a result of Sanofi's violatons of Mass. Gen. Laws Ann. Chap. 12 § 5B the

21    State of Massachusetts has been damaged in an amount far in excess of millions of

22

23    dollars exclusive of interest.

24    297.    Mr. Hamilton is a private person with direct and independent knowledge of

25    the allegations of the Compliant, who has brought this action pursuant to Mass. Gen.

26

27    Laws Ann Chap. 12 § 5(c(2) on behalf of himself and the State of Massachusetts.

28    298.    This Court is requested to accept supplemental jurisdiction of this related state

1    claim as it is predicated upon that exact same facts as the federal claim, and merely

2    asserts separate damage to the State of Massachusetts in the operation of its Medicaid

3

4    program.

5    299.  WHEREFORE, Relator respectfully requests this Court to award the

6    following damages to the following parties and against Sanofi:

7

8    To the STATE OF MASSACHUSETTS:

9    Three times the amount of actual damages which that State of Massachusetts has

10   sustained as a result of Sanofi's fraudulent and illegal practices;

11

12   A civil penalty of not less than $5,000 and not more than $10,000 for each false

13   claim which Sanofi caused to be presented to the State of Massachusetts;

14

15   Prejudgment interest; and

16

17   All costs incurred in bringing this action.

18

19   To RELATOR:

20   The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5F

21   and/or any other applicable provision of law;

22

23   Reimbursement for reasonable expenses which Relator incurred in connection

24   with this action;

25

26   An award of reasonable attorneys' fees and costs; and

27

28   Such further relief as this Court deems equitable and just.

## COUNT EIGHTEEN

### VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIM ACT

300. Relator re-alleges and incorporates the allegations in paragraphs 1- 299 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in Michigan. Upon information and belief, Sanofi's actions described herein occurred in Michigan as well.

301. This is a qui tam action brought by Relator and State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq.*

302. M.C.L.A. 400.607 provides liability for any person who, among other things—

> Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false.

> Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards.

303. In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of

a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

304. Sanofi violated M.C.L.A. 400.604 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

305. Sanofi furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2001 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

306. The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

307. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Sanofi's fraudulent and illegal practices.

308. Had the State of Michigan known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

309.  As a result of Sanofi's violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

310.  Mr. Hamilton is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to M.C.L.A. 400.610a on behalf of himself and the State of Michigan.

311.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

312.  WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF MICHIGAN:

All damages to which the State of Michigan is entitled pursuant to M.C.L.A. 400.612;

Civil penalties for each false claim which Sanofi caused to be presented to the State of Michigan;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or any

1  other applicable provision of law;

2

3  Reimbursement for reasonable expenses which Relator incurred in connection
4  with this action;

5

6  An award of reasonable attorneys' fees and costs; and

7

8  Such further relief as this Court deems equitable and just.

9

10  **COUNT NINETEEN**

11  **VIOLATION OF THE MONTANA FALSE CLAIMS ACT**

12  313.  Relator re-alleges and incorporates the allegations in paragraphs 1- 312 as if

13  fully set forth herein. Additionally, Relator states that upon information and belief, the

14
15  course of conduct described in this Complaint took place not only in Relator's region of

16  California, but was a nationwide practice of Sanofi.   Sanofi conducts business in

17  Montana.  Upon information and belief, Sanofi's actions described herein occurred in

18  Montana as well.
19

20  314.  This is a qui tam action brought by Relator and State of Montana for treble

21  damages and penalties under Montana False Claims Act, MT ST 17-8-401 *et seq.*

22  315.  MT ST 17-8-403  provides liability for any person who—
23

24  knowingly presenting or causing to be presented to an officer or employee of
25  the governmental entity a false claim for payment or approval;

26

27  knowingly making, using, or causing to be made or used a false record or
28  statement to get a false claim paid or approved by the governmental entity;

conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

316.   In addition, MT ST 45-6-313 prohibits the solicitation, receipt or offering any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Montana Medicaid program.

317.   Sanofi violated MT ST 45-6-313 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

318.   Sanofi furthermore violated MT ST 17-8-403 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Montana from at least 2001 to the present by its violation of federal and state laws, including MT ST 45-6-313, the Anti-Kickback Act and the Stark Act, as described herein.

319.   The State of Montana, by and through the Montana Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

320.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Sanofi's fraudulent and illegal practices.

321.   Had the State of Montana known that Sanofi was violating the federal and

state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

322. As a result of Sanofi's violations of MT ST 17-8-403 the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

323. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to MT ST 17-8-406 on behalf of himself and the State of Montana.

324. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

325. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF MONTANA:

Three times the amount of actual damages which that State of Montana has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of $10,000 for each false claim which Sanofi caused to be presented to the State of Montana;

Prejudgment interest; and

1   All costs incurred in bringing this action.

3   To RELATOR:

4   The maximum amount allowed pursuant to MT ST 17-8-410 and/or any other
5   applicable provision of law;

7   Reimbursement for reasonable expenses which Relator incurred in connection
8   with this action;

10   An award of reasonable attorneys' fees and costs; and

12   Such further relief as this Court deems equitable and just.

### COUNT TWENTY

### VIOLATION OF THE NEVADA FALSE CLAIMS ACT

326.   Relator re-alleges and incorporates the allegations in paragraphs 1- 325 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the State of Nevada.   Upon information and belief, Sanofi's actions described herein occurred in Nevada as well.

327.   This is a qui tam action brought by Relator and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010 et. seq.

328.   N.R.S. § 357.040(1) provides liability for any person who—

1  Knowingly presents or causes to be presented a false claim for payment or
2  approval;

3

4  Knowingly makes or uses, or causes to be made or used, a false record or
5  statement to obtain payment or approval of a false claim;

6

7  Conspires to defraud by obtaining allowance or payment of a false claim;

8

9  Is a beneficiary of an inadvertent submission of a false claim and, after
10  discovering the falsity of the claim, fails to disclose the falsity to the state
11  or political subdivision within a reasonable time.

12

13  329. In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt

14  of anything of value in connection with the provision of medical goods or services for

15  which payment may be made in whole or in part under the Nevada Medicaid program.

16  330. Sanofi violated N.R.S. § 422.560 from at least 2001 to the present by

17

18  engaging in the fraudulent and illegal practices described herein.

19  331. Sanofi furthermore violated N.R.S. § 357.040(1) and knowingly caused

20  hundreds of thousands of false claims to be made, used and presented to the State of

21  Nevada from at least 2001 to the present by its violation of federal and state laws,

22

23  including N.R.S. § 422.560, the Anti-Kickback Act and the Stark Act, as described

24  herein.

25  332. The State of Nevada, by and through the Nevada Medicaid program and other

26  health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the

27

28  claims submitted by health care providers and third party payers in connection

- 97 -
COMPLAINT FOR DAMAGES

1 | therewith.

2
3
4
5
6

333. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of clams submitted to the State of Nevada in connection with Sanofi's fraudulent and illegal practices.

7
8
9
10

334. Had the State of Nevada known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

11
12
13

335. As a result of Sanofi's violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive of interest.

14
15
16
17

336. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

18
19
20
21
22

337. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicted upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

23
24
25

338. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

26 | To the STATE OF NEVADA:

27
28

Three times the amount of actual damages which the State of Nevada has sustained as a result of Sanofi's fraudulent and illegal practices;

1

2    A civil penalty of not less than $2,000 and not more than $10,000 for each false

3    claim which Sanofi caused to be presented to the State of Nevada;

4

5    Prejudgment interest; and

6

7    All costs incurred in bringing this action.

8

9    To RELATOR:

10   The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other

11   applicable provision of law;

12

13   Reimbursement for reasonable expenses which Relator incurred in connection

14   with this action;

15

16   An award of reasonable attorneys' fees and costs; and

17

18   Such further relief as this Court deems equitable and just.

19                           **COUNT TWENTY-ONE**

20      **VIOLATION OF THE NEW HAMPSHIRE FALSE CLAIMS ACT**

21   339.  Relator re-alleges and incorporates the allegations in paragraphs 1- 338 as if

22   fully set forth herein. Additionally, Relator states that upon information and belief, the

23   course of conduct described in this Complaint took place not only in Relator's region of

24
25   California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the

26   New Hampshire.   Upon information and belief, Sanofi's actions described herein

27   occurred in New Hampshire as well.

28

340. This is a qui tam action brought by Relator and State of New Hampshire for treble damages and penalties under New Hampshire False Claims Act, N.H. Rev. Stat. § 167:61-b *et seq.*

341. N.H. Rev. Stat. § 167:61-b provides liability for any person who—

Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.

Conspires to defraud the department by getting a false or fraudulent claim allowed or paid.

342. Sanofi violated N.H. Rev. Stat. § 167:61-b and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Hampshire from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act as described herein.

343. The State of New Hampshire, by and through the New Hampshire Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

344. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an

express condition of payment of claims submitted to the State of New Hampshire in connection with Sanofi's fraudulent and illegal practices.

345. Had the State of New Hampshire known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

346. As a result of Sanofi's violations of N.H. Rev. Stat. § 167:61-b the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

347. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to N.H. Rev. Stat. § 167:61-c on behalf of himself and the State of New Hampshire.

348. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

349. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF NEW HAMPSHIRE:

> Three times the amount of actual damages which that State of New Hampshire has sustained as a result of Sanofi's fraudulent and illegal practices;

1  A civil penalty of not less than $5,000 and not more than $10,000 for each false

2  claim which Sanofi caused to be presented to the State of New Hampshire;

3

4  Prejudgment interest; and

5

6  All costs incurred in bringing this action.

7

8  To RELATOR:

9  The maximum amount allowed pursuant to N.H. Rev. Stat. § 167:61-e and/or any

10  other applicable provision of law;

11

12  Reimbursement for reasonable expenses which Relator incurred in connection

13  with this action;

14

15  An award of reasonable attorneys' fees and costs; and

16

17  Such further relief as this Court deems equitable and just.

18  ## COUNT TWENTY-TWO

19  ## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT

20  350.  Relator re-alleges and incorporates the allegations in paragraphs 1- 349 as if

21  fully set forth herein.  Additionally, Relator states that upon information and belief, the

22
23  course of conduct described in this Complaint took place not only in Relator's region of

24  California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the

25  New Jersey.  Upon information and belief, Sanofi's actions described herein occurred in

26
27  New Jersey as well.

28  351.  This is a qui tam action brought by Relator and State of New Jersey for treble

1  damages and penalties under New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.

2  352.  N.J.S.A. 2A:32C-3 provides liability for any person who—

3

4     Knowingly presents or causes to be presented to an employee, officer or

5     agent of the State, or to any contractor, grantee, or other recipient of State

6     funds, a false or fraudulent claim for payment or approval;

7

8     Knowingly makes, uses, or causes to be made or used a false record or

9     statement to get a false or fraudulent claim paid or approved by the State;

10

11    Conspires to defraud the State by getting a false or fraudulent claim allowed

12    or paid by the State.

13

14  353.  In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any

15  kickback, rebate or bribe in connection with the furnishing of items or services for

16  which payment is or may be made in whole or in part under the New Jersey Medicaid

17

18  program, or the furnishing of items or services whose cost is or may be reported in

19  whole or in part in order to obtain benefits or payments under New Jersey Medicaid.

20  354.  Sanofi violated N.J.S.A. 30:4D-17 from at least 2001 to the present by

21

22  engaging in the fraudulent and illegal practices described herein.

23  355.  Sanofi furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused

24  hundreds of thousands of false claims to be made, used and presented to the State of

25

26  Nevada from at least 2001 to the present by its violation of federal and state laws,

27  including N.J.S.A. 30:4D-17, the Anti-Kickback Act and the Stark Act, as described

28  herein.

356. The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

357. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Sanofi's fraudulent and illegal practices.

358. Had the State of New Jersey known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

359. As a result of Sanofi's violations of N.J.S.A. 2A:32C-3 the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

360. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to N.J.S.A. 2A:32C-5 on behalf of himself and the State of New Jersey.

361. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

362. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF NEW JERSEY:

Three times the amount of actual damages which that State of New Jersey has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the State of New Jersey;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT TWENTY-THREE

## VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT AND THE FRAUD AGAINST TAXPAYERS ACT

363. Relator re-alleges and incorporates the allegations in paragraphs 1- 362 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in the State of New Mexico. Upon information and belief, Sanofi's actions described herein occurred in the State of New Mexico as well.

364. This is a qui tam action brought by Relator and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 *et seq.* and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 44-9-1 *et seq.*

365. N. M. S. A. 1978, § 27-14-4 provides liability for any person who-

Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program

Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false

Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent

366. N.M.S.A. 1978 § 44-9-3 provides liability for any person who-

1    knowingly presents, or causes to be presented, to an employee, officer or
2    agent of the state or to a contractor, grantee or other recipient of state funds a
     false or fraudulent claim for payment or approval;
3
     knowingly makes or uses, or causes to be made or used, a false, misleading
4    or fraudulent record or statement to obtain or support the approval of or the
5    payment on a false or fraudulent claim;

6    conspires to defraud the state by obtaining approval or payment on a false or
     fraudulent claim;
7
     conspires to make, use or cause to be made or used, a false, misleading or
8    fraudulent record or statement to conceal, avoid or decrease an obligation to
9    pay or transmit money or property to the state.

10   367.   Sanofi violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3
11
     from at least 2001 to the present by engaging in the fraudulent and illegal practices
12
13   described herein.

14   368.   Sanofi furthermore violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 §
15   44-9-3 and knowingly caused thousands of false claims to be made, used and presented
16
17   to the State of New Mexico from at least 2001 to the present by its violation of federal
18   and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

19   369.   The State of New Mexico, by and through the State of New Mexico Medicaid
20
21   program and other state health care programs, and unaware of Sanofi's fraudulent and
22   illegal practices, paid the claims submitted by health care providers and third payers in
23   connection therewith.

24   370.   Compliance with applicable Medicare, Medicaid and the various other federal
25
26   and state laws cited herein was an implied, and upon information and belief, also an
27   express condition of payment of claims submitted to the State of New Mexico in
28   connection with Sanofi's fraudulent and illegal practices.

371. Had the State of New Mexico known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

372. As a result of Sanofi's violations of N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

373. Mr. Hamilton is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N. M. S. A. 1978, § 27-14-7 and N. M. S. A. 1978, § 44-9-5 on behalf of himself and the State of New Mexico.

374. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

375. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF NEW MEXICO:

Three times the amount of actual damages which the State of New Mexico has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false

1    claim which Sanofi caused to be presented to the State of New Mexico;

3    Prejudgment interest; and

5    All costs incurred in bringing this action.

7    To RELATOR:

8    The maximum amount allowed pursuant to N. M. S. A. 1978, § 27-14-9 and N.
9    M. S. A. 1978, § 44-9-7 and /or any other applicable provision of law;

11   Reimbursement for reasonable expenses which Relator incurred in connection
12   with this action;

14   An award of reasonable attorneys' fees and costs; and

16   Such further relief as this court deems equitable and just.

## COUNT TWENTY-FOUR
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT

376.   Relator re-alleges and incorporates the allegations in paragraphs 1- 375 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in the New York. Upon information and belief, Sanofi's actions described herein occurred in New York as well.

377.   This is a qui tam action brought by Relator and State of New York for treble

damages and penalties under New York False Claims Act, McKinney's State Finance Law § 187 *et seq.*

378. McKinney's State Finance Law § 189 provides liability for any person who—

Knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government;

Conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid.

379. Sanofi violated § 189 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

380. Sanofi furthermore violated § 189 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

381. The State of New York, by and through the New York Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

382. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Sanofi's fraudulent and illegal practices.

383. Had the State of New York known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

384. As a result of Sanofi's violations of § 189 the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

385. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to McKinney's State Finance Law § 190(2) on behalf of himself and the State of New York.

386. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

387. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF NEW YORK:

Three times the amount of actual damages which that State of New York has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the State of New York;

Prejudgment interest; and

1

2      All costs incurred in bringing this action.

3

4      To RELATOR:

5          The maximum amount allowed pursuant to McKinney's State Finance Law §

6          190(6) and/or any other applicable provision of law;

7

8          Reimbursement for reasonable expenses which Relator incurred in connection

9          with this action;

10

11         An award of reasonable attorneys' fees and costs; and

12

13         Such further relief as this Court deems equitable and just.

14

15                            **COUNT TWENTY-FIVE**

16      **VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT**

17      388.   Relator re-alleges and incorporates the allegations in paragraphs 1- 387 as if

18      fully set forth herein. Additionally, Relator states that upon information and belief, the

19      course of conduct described in this Complaint took place not only in Relator's region of

20      California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the

21      State of Oklahoma.   Upon information and belief, Sanofi's actions described herein

22

23      occurred in the State of Oklahoma as well.

24      389.   This is a qui tam action brought by Relator and the State of Oklahoma to

25      recover treble damages and civil penalties under the Oklahoma Medicaid False Claims

26

27      Act, 63 Okl. St. Ann. § 5053 *et seq.*.

28

390. 63 Okl. St. Ann. § 5053.1 provides liability for any person who-

Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

391. In addition, 56 Okl. St. Ann. § 1005 prohibits solicitation or acceptance of a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

392. Sanofi violated 56 Okl. St. Ann. § 1005 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

393. Sanofi furthermore violated 63 Okl. St. Ann. § 5053.1 and knowingly caused thousands of false claims to be made, used and presented to the State of Oklahoma from at least 2001 to the present by its violation of federal and state laws, including 56 Okl. St. Ann. § 1005, the Anti-Kickback Act, and Stark Act, as described herein.

394. The State of Oklahoma, by and through the State of Oklahoma Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in

1 connection therewith.

2
3
4
5
6
395. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Sanofi's fraudulent and illegal practices.

7
8
9
10
11
12
396. Had the State of Oklahoma known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

13
14
15
16
397. As a result of Sanofi's violations of 63 Okl. St. Ann. § 5053.1 the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

17
18
19
398. Mr. Hamilton is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 63 Okl. St. Ann. § 5053.2(B) on behalf of himself and the State of Oklahoma.

20
21
22
23
24
25
399. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

26
27
400. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

28

To the STATE OF OKLAHOMA:

Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the State of Oklahoma;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant 63 Okl. St. Ann. § 5053.4 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT TWENTY-SIX

### VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT

401.   Relator re-alleges and incorporates the allegations in paragraphs 1- 400 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of

1  California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the

2  State of Rhode Island.  Upon information and belief, Sanofi's actions described herein

3
4  occurred in the State of Rhode Island as well.

5  402.  This is a qui tam action brought by Relator and the State of Rhode Island to

6  recover treble damages and civil penalties under the Rhode Island False Claims Act,

7
8  Gen. Laws 1956, § 9-1.1-1 *et seq.*

9  403.  Gen. Laws 1956, § 9-1.1-3 provides liability for any person who-

10      knowingly presents, or causes to be presented, to an officer or employee of
11      the state or a member of the guard a false or fraudulent claim for payment or
        approval;
12
13      knowingly makes, uses, or causes to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the state;
14
        conspires to defraud the state by getting a false or fraudulent claim allowed
15      or paid.

16  404.  In addition, Gen. Laws 1956, § 40-8.2-3 prohibits the solicitation, receipt,

17  offer, or payment of any remuneration, including any kickback, bribe, or rebate, directly
18
19  or indirectly, in cash or in kind, to induce referrals from or to any person in return for

20  furnishing of services or merchandise or in return for referring an individual to a person

21  for the furnishing of any services or merchandise for which payment may be made, in
22
23  whole or in part, under the Rhode Island Medicaid program.

24  405.  Sanofi violated Gen. Laws 1956, § 40-8.2-3 from at least 2001 to the present

25  by engaging in the fraudulent and illegal practices described herein.

26
27  406.  Sanofi furthermore violated Gen. Laws 1956, § 9-1.1-3 and knowingly caused

28  thousands of false claims to be made, used and presented to the State of Rhode Island

from at least 2001 to the present by its violation of federal and state laws, including Gen. Laws 1956, § 40-8.2-3, the Anti-Kickback Act, and Stark Act, as described herein.

407. The State of Rhode Island, by and through the State of Rhode Island Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

408. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Sanofi's fraudulent and illegal practices.

409. Had the State of Rhode Island known that Sanofi was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

410. As a result of Sanofi's violations of Gen. Laws 1956, § 9-1.1-3 the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

411. Mr. Hamilton is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Gen. Laws 1956, § 9-1.1-4(b) on behalf of himself and the State of Rhode Island.

412. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

413. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF RHODE ISLAND:

Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Sanofi's fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Sanofi caused to be presented to the State of Rhode Island;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant Gen. Laws 1956, § 9-1.1-4(d) and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT TWENTY-SEVEN

### VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT

414.   Relator re-alleges and incorporates the allegations in paragraphs 1- 413 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the State of Tennessee.   Upon information and belief, Sanofi's actions described herein occurred in Tennessee as well.

415.   This is a qui tam action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.

416.   Section 71-5-182(a)(1) provides liability for any person who—

Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for a approved by the state knowing such record or statement is false;

Conspires to defraud the State by getting a claim allowed or paid under the

Medicaid program knowing such claim is false or fraudulent.

417.   Sanofi violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused

hundreds of thousands of false claims to be made, used and presented to the State of Tennessee from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

418. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

419. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Sanofi's fraudulent and illegal practices.

420. Had the State of Tennessee known that Sanofi violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Sanofi's fraudulent and illegal practices.

421. As a result of Sanofi's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

422. Mr. Hamilton is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

423. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely

1   asserts separate damage to the State of Tennessee in the operation of its Medicaid

2   program.

3

4   424. WHEREFORE, Relator respectfully requests this Court to award the

5   following damages to the following parties and against Sanofi:

6

7   To the STATE OF TENNESSEE:

8   Three times the amount of actual damages which the State of Tennessee has
    sustained as a result of Sanofi's fraudulent and illegal practices;

9

10

11  A civil penalty of not less than $5,000 and not more than $10,000 for each false
    claim which Sanofi caused to be presented to the State of Tennessee;

12

13

14  Prejudgment interest; and

15

16  All costs incurred in bringing this action.

17

18  To RELATOR:

19  The maximum amount allowed to Tenn. Code Ann. §71-5-183(c) and/or any
    other applicable provision of law;

20

21

22  Reimbursement for reasonable expenses which Relator incurred in connection
    with this action;

23

24

25  An award of reasonable attorneys' fees and costs; and

26

27  Such further relief as this Court deems equitable and just.

28

- 121 -
COMPLAINT FOR DAMAGES

## COUNT TWENTY-EIGHT

### VIOLATION OF THE TEXAS FALSE CLAIMS ACT

425. Relator re-alleges and incorporates the allegations in paragraphs 1-424 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in the State of Texas. Upon information and belief, Sanofi's actions described herein occurred in Texas as well.

426. This is a qui tam action brought by Relator and the State of Texas to recover double damages and civil penalties under the Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 et seq.

427. V.T.C.A. Hum. Res. Code § 36.002, in relevant part, provides liability for any person who—

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on

1 | whose behalf it was received

\* \* \*

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

\* \* \*

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

\* \* \*

(9) knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

\* \* \*

(12) knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

428. Sanofi violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of

1  Texas from at least 2001 to the present by its violation of federal and state laws,

2  including, the Anti-Kickback Act and the Stark Act, as described herein.

3

4  429.  The State of Texas, by and through the Texas Medicaid program and other

5  state healthcare programs, and unaware of Sanofi's fraudulent and illegal practices, paid

6  the claims submitted by health care providers and third party payers in connection

7  therewith.

8

9  430.  Compliance with applicable Medicare, Medicaid and the various other federal

10 and state laws cited herein was implied, and upon information and belief, also an

11 express condition of payment of claims submitted to the State of Texas in connection

12

13 with Sanofi's fraudulent and illegal practices.

14 431.  Had the State of Texas known that Sanofi was violating the federal and state

15 laws cited herein, it wound not have paid the claims submitted by health care providers

16 and third party payers in connection with Sanofi's fraudulent and illegal practices.

17

18 432.  As a result of Sanofi's violations of V.T.C.A. Hum. Res. Code § 36.002, the

19 State of Texas has been damaged in an amount far in excess of millions of dollars

20 exclusive of interest.

21

22 433.  Sanofi did not, within 30 days after it first obtained information as to such

23 violations, furnish such information to officials of the State responsible for investigating

24 false claims violations, did not otherwise fully cooperate with any investigation of the

25 violations, and have not otherwise furnished information to the State regarding the

26 claims for reimbursement at issue.

27

28 434.  Mr. Hamilton is a private person with direct and independent knowledge of

- 124 -
COMPLAINT FOR DAMAGES

the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

435.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

436.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Sanofi:

To the STATE OF TEXAS:

Damages at two times the value of any payment or monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts set forth above, as provided by the Texas Human Resources Code § 36.052(a)(1) & (4)

Civil penalties of $15,000 for each and every unlawful act set forth above that resulted in injury to a person younger than 18 years of age, as provided by the Texas Human Resources Code § 36.052(3)(A)

Pre- and post-judgment interest, Tex. Hum. Res. Code § 36.052(a)(2),

To RELATOR:

The maximum amount allowed pursuant to V.T.C.A. Hum Res. Code § 36.110(a), and/or any other applicable provision of law;

Reimbursement for reasonable expenses and costs which Relator incurred in connection with this action, Tex Hum Res. Code §§ 36.007 & 36.110(c);;;

1   Reasonable attorneys' fees which the Relator necessarily incurred in bringing and

2   pressing this case, Tex Hum Res. Code §§ 36.007 & 36.110(c); and

3

4   Such further relief as this Court deems equitable and just.

5

## COUNT TWENTY-NINE

6

7   ## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

8   437.   Relator re-alleges and incorporates the allegations in paragraphs 1- 436 as if

9   fully set forth herein. Additionally, Relator states that upon information and belief, the

10   course of conduct described in this Complaint took place not only in Relator's region of

11
     California, but was a nationwide practice of Sanofi.  Sanofi conducts business in the
12

13   Commonwealth of Virginia.  Upon information and belief, Sanofi's actions described

14   herein occurred in the Commonwealth of Virginia as well.

15
     438.   This is a qui tam action brought by Relator and the Commonwealth of
16

17   Virginia to recover treble damages and civil penalties under the Virginia Fraud Against

18   Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.

19   439.   Va. Code Ann. § 8.01-216.3 provides liability for any person who-

20

21   Knowingly presents, or causes to be presented, to an officer or employee

22   of the Commonwealth a false or fraudulent claim for payment or approval;

23

24   Knowingly makes, uses, or causes to be made or used, a false record or

25   statement to get a false or fraudulent claim paid or approved by the

26   Commonwealth

27

28   Conspires to defraud the Commonwealth by getting a false or fraudulent

1    claim allowed or paid

2    440. Sanofi violated Va. Code Ann. § 8.01-216.3 from at least 2001 to the present
3
4    by engaging in the fraudulent and illegal practices described herein.

5    441. Sanofi furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly
6    caused thousands of false claims to be made, used and presented to the Commonwealth
7
8    of Virginia from at least 2001 to the present by its violation of federal and state laws,
9    including the Anti-Kickback Act and Stark Act, as described herein.

10   442. The Commonwealth of Virginia, by and through the Commonwealth of
11   Virginia Medicaid program and other state health care programs, and unaware of
12
13   Sanofi's fraudulent and illegal practices, paid the claims submitted by health care
14   providers and third payers in connection therewith.

15   443. Compliance with applicable Medicare, Medicaid and the various other federal
16
17   and state laws cited herein was an implied, and upon information and belief, also an
18   express condition of payment of claims submitted to the Commonwealth of Virginia is
19   connection with Sanofi's fraudulent and illegal practices.

20
21   444. Had the Commonwealth of Virginia known that Sanofi was violating the
22   federal and state laws cited herein, it would not have paid the claims submitted by
23   health care providers and third party payers in connection with Sanofi's fraudulent and
24   illegal practices.
25

26   445. As a result of Sanofi's violations of Va. Code Ann. § 8.01-216.3 the
27   Commonwealth of Virginia has been damaged in an amount far in excess of millions of
28   dollars exclusive of interest.

1    446.  Mr. Hamilton is private person with direct and independent knowledge of the

2    allegations of this Complaint, who has brought this action pursuant to Va. Code Ann. §

3
4    8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia

5    447.  This Court is requested to accept supplemental jurisdiction of this related state

6    claim as it is predicated upon the exact same facts as the federal claim, and merely

7
8    asserts separate damage to the Commonwealth of Virginia in the operation of its

9    Medicaid program.

10   448.  WHEREFORE, Relator respectfully requests this Court to award the

11   following damages to the following parties and against Sanofi:
12

13   To the COMMONWEALTH OF VIRGINIA:

14

15      Three times the amount of actual damages which the Commonwealth of Virginia

16      has sustained as a result of Sanofi's fraudulent and illegal practices;

17

18      A civil penalty of not less than $5,000 and not more than $10,000 for each false

19      claim which Sanofi caused to be presented to the Commonwealth of Virginia;

20

21      Prejudgment interest; and

22

23      All costs incurred in bringing this action.

24

25   To RELATOR:

26

27      The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or

28      any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT THIRTY

## VIOLATION OF THE WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT

449. Relator re-alleges and incorporates the allegations in paragraphs 1- 448 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of Sanofi. Sanofi conducts business in the State of Wisconsin. Upon information and belief, Sanofi's actions described herein occurred in the State of Wisconsin as well.

450. This is a qui tam action brought by Relator and the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, W.S.A. 20.931 *et seq.*

451. W.S.A. 20.931(2) provides liability for any person who-

Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

1

2

3

4

> Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

5

6

7

8

9

10

452. In addition, W.S.A. 49.49(2) prohibits solicitation or receipt of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under any Wisconsin medical assistance program.

11

12

13

453. Sanofi violated W.S.A. 49.49(2) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

14

15

16

17

18

454. Sanofi furthermore violated W.S.A. 20.931(2) and knowingly caused thousands of false claims to be made, used and presented to the State of Wisconsin from at least 2001 to the present by its violation of federal and state laws, including W.S.A. 49.49(2), the Anti-Kickback Act, and Stark Act, as described herein.

19

20

21

22

23

455. The State of Wisconsin, by and through the State of Wisconsin Medicaid program and other state health care programs, and unaware of Sanofi's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

24

25

26

27

28

456. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Wisconsin in connection with Sanofi's fraudulent and illegal practices.

- 130 -
COMPLAINT FOR DAMAGES

1    457.   Had the State of Wisconsin known that Sanofi was violating the federal and

2    state laws cited herein, it would not have paid the claims submitted by health care

3

4    providers and third party payers in connection with Sanofi's fraudulent and illegal

5    practices.

6    458.   As a result of Sanofi's violations of W.S.A. 20.931(2) the State of Wisconsin

7    has been damaged in an amount far in excess of millions of dollars exclusive of interest.

8

9    459.   Mr. Hamilton is private person with direct and independent knowledge of the

10   allegations of this Complaint, who has brought this action pursuant to W.S.A. 20.931(5)

11   on behalf of himself and the State of Wisconsin.

12

13   460.   This Court is requested to accept supplemental jurisdiction of this related state

14   claim as it is predicated upon the exact same facts as the federal claim, and merely

15   asserts separate damage to the State of Wisconsin in the operation of its Medicaid

16

17   program.

18   461.   WHEREFORE, Relator respectfully requests this Court to award the

19   following damages to the following parties and against Sanofi:

20

21   To the STATE OF WISCONSIN:

22       Three times the amount of actual damages which the State of Wisconsin has

23       sustained as a result of Sanofi's fraudulent and illegal practices;

24

25       A civil penalty of not less than $5,000 and not more than $10,000 for each false

26       claim which Sanofi caused to be presented to the State of Wisconsin;

27

28       Prejudgment interest; and

- 131 -
COMPLAINT FOR DAMAGES

1

2 All costs incurred in bringing this action.

3

4 To RELATOR:

5  The maximum amount allowed pursuant W.S.A. 20.931(11) and /or any other

6  applicable provision of law;

7

8  Reimbursement for reasonable expenses which Relator incurred in connection

9  with this action;

10

11  An award of reasonable attorneys' fees and costs; and

12

13 Such further relief as this court deems equitable and just.

14

15

16

## DEMAND FOR JURY TRIAL

17

18 Relator hereby demands a jury trial.

19

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

Dated: April 15, 2008

**UNITED STATES OF AMERICA, ex rel.**

**Relator**

By: _____

**WATERS & KRAUS LLP**
C. Andrew Waters, CA Bar No. 147259
Michael L. Armitage, CA Bar No. 152740
Michael B. Gurien, CA Bar No. 180538
Paul Cook, CA Bar No. 170901
222 N. Sepulveda Blvd.
Suite 1900
El Segundo, California 90245
Tel. 310-414-8146
Fax. 310-414-8156

Charles S. Siegel, TX Bar No. 18341875
Loren Jacobson, TX Bar No. 24050813
3219 McKinney Ave.
Dallas, Texas 75204
Tel. 214-357-6244
Fax. 214-871-2263

Of Counsel:
Mychal Wilson, Esq.
MindFusion Law Corp.
1875 Century Park East, 6th Fl.
Los Angeles, CA 90067
Tel. 310-407-5380
Fax. 310-407-5499

*ATTORNEYS FOR RELATOR*

///

///

COMPLAINT FOR DAMAGES